NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| BENECARD SERVICES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>ALLIED WORLD SPECIALTY INSURANCE COMPANY f/k/a DARWIN NATIONAL ASSURANCE COMPANY, et al.,<br><br>Defendants. | Civil Action No. 15-8593 (MAS) (TJB)<br><br>**MEMORANDUM OPINION** |

SHIPP, District Judge

This matter comes before the Court upon Plaintiff Benecard Services Inc.'s ("Benecard") Motion for Partial Summary Judgment Against Atlantic Specialty Insurance Company ("Atlantic Specialty") (the "Motion") (ECF No. 168), and Atlantic Specialty's Opposition to Benecard's Motion and Cross-Motion for Summary Judgment (the "Cross-Motion") (ECF No. 175). Defendant RSUI Indemnity Company ("RSUI") joined in the Cross-Motion "with respect to whether RSUI Policy No. HS657057 affords coverage to [Benecard] for the underlying action" ("RSUI's Motion") (ECF No. 178). Benecard opposed Atlantic Specialty's Cross-Motion (ECF No. 186), and Atlantic Specialty filed a reply (ECF No. 198) in which RSUI joined sections I through IV (ECF No. 199). The Court has carefully considered the parties' arguments and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Benecard's Motion for Partial Summary Judgement is denied and Atlantic Specialty's

Cross-Motion for Summary Judgment is granted. All claims as to Atlantic Specialty (i.e., Counts II, VII, and IX) are dismissed with prejudice. Further, RSUI's Motion is granted, and Count III, to the extent Benecard seeks coverage under Excess Liability Policy Number HS657057, is dismissed with prejudice.

## I.   BACKGROUND

### A.   Undisputed Facts

#### 1.   The Smart Action

In 2012, Smart Insurance Company ("Smart") was approved by the Centers for Medicare and Medicaid Services ("CMS") to act as a Medicare Part D plan sponsor. (Benecard's Statement of Material Facts Against Atlantic Specialty ("BMFAS") ¶ 2, ECF No. 168-2 (citing Smart's Compl. ¶ 24, Ex. A to Certification of Anthony Bartell ("Bartell Cert."), ECF No. 168-4); Atlantic Specialty's Responsive Statement of Material Fact ("ASRMF") ¶ 2, ECF No. 175-2.) Benecard agreed to provide Smart with certain services in connection with the Part D plans. (BMFAS ¶ 3 (citing Smart's Compl. ¶¶ 12–19); ASRMF ¶ 3.) As alleged by Smart, Benecard was tasked with (1) handling all matters related to member enrollment; (2) managing the plan formulary and adjudicating member claims for coverage at the point of sale; (3) administering the coverage determination, appeal, and grievance process; (4) providing Smart with real-time, online access to Benecard's prescription drug claims database and system; (5) running the call center and answering member questions; and (6) complying with federal law and CMS requirements. (Smart's Compl. ¶ 19.)

On April 23, 2013, after auditing the plans, CMS sanctioned Smart, suspending enrollment in and marketing of the plans. (BMFAS ¶ 4 (citing Smart's Compl. ¶ 50); ASRMF ¶ 4.) The day before CMS imposed sanctions, Smart wrote to Benecard advising it that "a dispute between [Smart and Benecard] is a likelihood," and asking Benecard to "preserv[e] the documents relevant

2

to the parties' relationship" and to "take whatever actions are necessary to preserve status quo and protect the parties' respective rights and obligations." (BMFAS ¶¶ 6–7 (quoting Smart's Apr. 22, 2014 Correspondence, Ex. B to Bartell Cert., ECF No. 168-5); ASRMF ¶¶ 6–7.) Smart sold the plans that August and, on December 15, 2014, advised Benecard that it "intend[ed] to pursue claims against [it] for, among other things, breach of contract and fraud." (BMFAS ¶¶ 5–8 (quoting Smart's Dec. 15, 2014 Correspondence, Ex. C to Bartell Cert., ECF No. 168-6); ASRMF ¶ 8.)

On June 8, 2015, Smart filed suit against Benecard in the United States District Court for the Southern District of New York, (BMFAS ¶ 9; ASRMF ¶ 9), alleging claims "aris[ing] out of the failure of Benecard to perform its contractual obligation to manage Smart's Medicare Part D Prescription Drug plans," and "out of a number of intentionally false representations and material omissions that Benecard made to convince Smart not to terminate their contract," (Smart's Compl. ¶ 1). Smart asserted two counts: (1) breach of contract and (2) fraudulent misrepresentation, omission, or concealment. (*Id.* ¶¶ 92, 101–05.)

Beginning with the contractual failures, (*id.* ¶¶ 27, 54–55), Smart alleged that,

> [a]fter the Plans were launched on January 1, 2013, Smart's monitoring efforts uncovered a number of problems with Benecard's performance, including but not limited to: (a) its failure to properly handle and process a number of beneficiary enrollment requests, (b) its failure to provide required information to beneficiaries in a timely manner, (c) its failure to provide a toll-free claims service to answer general program questions and specific inquiries from beneficiaries, providers and pharmacies, (d) its failure to provide proper notice to Smart of certain compliance issues and (e) its improper rejection of claims at the point-of-sale.

(*Id.* ¶ 33.) Smart claimed that its supervision of Benecard's efforts to redress those problems "were thwarted by Benecard's . . . efforts to conceal the true nature and extent of its problems from Smart." (*Id.* ¶ 35.) According to Smart, Benecard knew even before the launch date that it was not going to be ready to process claims or handle coverage determination requests, appeals, and

grievances, and that significant problems were going to occur on launch. (*Id.* ¶ 38.) Nevertheless, Smart alleged, Benecard "concealed the information," and "Benecard's senior management, including Chief Executive Officer Michael Perry, instructed Benecard's staff to make sure Smart falsely believed Benecard would be ready to launch the Plans by January 1, 2013. (*Id.*) Smart claimed Benecard ignored its corrective efforts, refused assistance, and spurned Smart's repeated requests for real-time access to its systems until the eve of CMS's audit. (*Id.* ¶¶ 39–42.) After CMS's audit identified several problems with Benecard's system, including the improper denial of prescription drug coverage at the point of sale, Smart alleged "Benecard represented to Smart that it had fixed the identified problems." (*Id.* ¶¶ 39–42, 47.) According to Smart, CMS's sampling of claims showed Benecard had not fixed many of the issues and identified ten new deficiencies. (*Id.* ¶ 47.) CMS imposed sanctions, including prohibiting new member enrollment and marketing, which Smart alleged cost it "tens of thousands of new members and millions of dollars." (*Id.* ¶ 50.)

Turning to Benecard's alleged "misrepresentations, omissions and concealment," Smart alleged Benecard "made a number of false representations and material omissions" and "concealed critical information from Smart, knowingly and intentionally and with the goal of ensuring that Smart did not terminate the Agreement." (*Id.* ¶¶ 56–57.) As an example, Smart alleged that "Benecard representatives, including Michael Perry, represented to Smart throughout the last quarter of 2012 that Benecard would be ready to handle its claim processing responsibilities and coverage determination, appeal[,] and grievance processing responsibilities on January 1, 2013." (*Id.* ¶ 58.) Smart further alleged, however, that "Benecard knew these representations were false," and "Perry instructed his staff to conceal from Smart that Benecard would not be ready and that it was falling further and further behind schedule." (*Id.*) Smart further alleged, among many other examples, that Benecard's senior personnel instructed its employees to ignore Smart's corrective

4

action plans, that Benecard assigned untrained personnel to its call center after telling Smart it would rapidly increase the number of properly trained staff, and that Benecard's Chief Operating Officer told employees that its system was proprietary and that Smart would not be given access to it after repeatedly representing to Smart that it would be given real-time online access. (*Id.* ¶¶ 59–61.) Smart asserted that "[w]hen Benecard made these misrepresentations and omissions to Smart, it knew they were false, or, alternatively, it made them recklessly and without knowledge as to their truth or falsity," that Benecard "knew it was concealing information that was material to Smart in determining whether to terminate the Agreement" and "made these statements and omissions with the intention of Smart relying on them, with the intent to deceive Smart or with reckless disregard." (*Id.* ¶¶ 97–99.) Smart claimed that, "[i]f Benecard had not made these misrepresentations and omissions, and if Smart had been aware of the true nature and depth of the problems at Benecard, Smart would have terminated the Agreement, switched to a new [pharmacy benefit manager] much earlier and saved its Plans from further damage." (*Id.* ¶ 69.) Smart asserted it had been damaged as a result of Benecard's misrepresentations, omissions, and concealment. (*Id.* ¶ 104.) Benecard and Smart settled in September 2016. (BMFAS ¶ 14; ASRMF ¶ 14.)

### 2.   Benecard's Insurance Policies

Benecard purchased from Allied World Assurance Company (US) Inc. ("Allied World") a directors and officers liability policy (the "Allied World D&O Policy"), (Am. Compl. ¶ 11, ECF No. 57), and a Managed Care Errors and Omissions Liability Insurance Policy (the "Allied World E&O Policy") that covers claims for "any actual or alleged[]error or omission in the performance of, or any failure to perform, a Managed Care Activity," (Atlantic Specialty's Statement of Undisputed Material Facts ("ASMF") ¶¶ 15–16 (quoting Managed Care Errors and Omissions Liability Insurance Policy § IV(W) (defining "Wrongful Act"), Ex. E to Declaration of

5

Thomas J. Judge ("Judge Decl."), ECF No. 175-2); Benecard's Response to Atlantic Specialty's Statement of Undisputed Material Facts ("BRASMF") ¶¶ 15–16, ECF No. 186-1).

Benecard also purchased a Healthcare Organization Management Liability Policy (the "Atlantic Specialty Policy" or the "Policy") from Atlantic Specialty, effective April 30, 2014, through April 12, 2015. (BMFAS ¶ 15; ASRMF ¶ 15.) The Atlantic Specialty Policy provides:

> The Underwriter will pay, on behalf of the **Organization**, **Loss** from any **Claim** first made against the **Organization** during the **Policy Period** . . . for a **Wrongful Act** . . . .

(Atlantic Specialty Policy Directors, Officers & Organization Liability Coverage Section ("Atlantic Specialty Policy D&O Section"), at § I(C), Ex. E to Bartell Cert., ECF No. 168-8).) A "Wrongful Act" is defined as:

> (1) any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by any **Insured Person** in his or her capacity as such, or any matter asserted against any **Insured Person** solely by reason of his or her status as such;
>
> (2) for the purposes of Insuring Agreement (C) of this Coverage Section, any actual or alleged act, error; omission, misstatement, misleading statement or breach of duty by the **Organization** . . . .

(*Id.* at § II(Z)) (emphasis in original). The Defense and Settlement Section states,

> (A) It shall be the duty of the **Insureds** and not the duty of the Underwriter to defend any **Claim** covered by this Coverage Section. The Underwriter shall have the right to participate with the **Insureds** in the investigation, defense and settlement of any **Claim** . . . ,
>
> (B) Upon written request, the Underwriter will pay **Defense Expenses** owed under this Coverage Section on a current basis. Such advanced payments by the Underwriter shall be repaid to the Underwriter by the **Insureds** severally according to their respective interests in the event and to the extent that the **Insureds** shall not be entitled to payment . . . . Except for **Defense Expenses** paid in accordance with this paragraph (B), the Underwriter will have no obligation to pay any **Loss**; before the final disposition of a **Claim**.

(*Id.* at § VI(A)–(B) (emphasis in original)).

The Atlantic Specialty Policy contains several coverage exclusions, including the following:

> This Coverage Section does not apply to, and no coverage will be available under this Coverage Section for, **Loss** from any **Claim**:
>
> . . .
>
> (K) [the "Fraud Exclusion"] made against any **Insured** based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving: (1) such **Insured** having gained in fact any profit, remuneration or advantage to which such **Insured** is not legally entitled; or (2) the committing of any deliberately fraudulent or dishonest act or omission, or any willful violation of any statute, rule or law, by such **Insured;** provided, that this EXCLUSION (K) shall not apply unless the gaining by such **Insured** of such profit, remuneration or advantage to which such **Insured** is not legally entitled, or the deliberately fraudulent or dishonest act or omission or willful violation of statute, rule or law, has been established by a final adjudication of the **Claim** or final adjudication in any judicial or administrative proceeding;
>
> . . .
>
> (P) [the "Managed Care Exclusion"] based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error or omission in the performance of, or failure to perform, **Managed Care Activities** by any **Insured** or by any individual or entity for whose acts, errors or omissions any **Insured** is legally responsible; provided, that this EXCLUSION (P) shall not apply to any **Claim** for an actual or alleged, act, error or omission in connection with the performance of, or failure to perform, **Provider Selection** otherwise covered by this Coverage Section . . . .

(*Id.* at § III(K), (P) (emphasis in original)). "Managed Care Activities" are defined in the Policy as "any of the following services or activities . . . : Provider Selection; Utilization Review; advertising, marketing, selling, or enrollment for . . . prescription drug [plans], . . . Claim Services; . . . and services or activities performed in the administration or management of . . . prescription drug [plans]." (*Id.* at § II(M) (emphasis omitted).) "Utilization Review" is defined as "the process of evaluating the appropriateness, necessity or cost of Medical Services provided or to be provided by an Insured or for purposes of determining whether payment or coverage for such Medical Services will be authorized or paid for under any . . . prescription drug . . . plans." (*Id.* at § II(Y)

(emphasis omitted).) And "Medical Services" means "health care, medical care, or treatment provided to any individual, including . . . the use, prescription, furnishing or dispensing of medications, drugs, blood, blood products or medical, surgical, dental or psychiatric supplies, equipment or appliances in connection with such care." (*Id.* at § II(N) (emphasis omitted).)

Benecard also purchased an Excess Liability Policy from RSUI. (Excess Liability Policy, Ex. B to Declaration of Aileen F. Droughton ("Droughton Decl."), ECF No. 178-3.) The Excess Liability Policy is a "followed-form" policy, providing excess coverage above the underlying policy. (*Id.* at §§ I, II(A), III; Excess Liability Policy Decls. at 1.) The underlying policy with respect to the Excess Liability Policy at issue here is the Atlantic Specialty Policy. (Excess Liability Policy Decls. at 1.)

On June 18, 2014, Benecard notified Atlantic Specialty of Smart's April 22, 2014 correspondence advising Benecard a dispute between them was likely. (Benecard's Suppl. Statement of Material Facts Against Atlantic Specialty ("BSMFAS") ¶ 7, ECF No. 186-1; Atlantic Specialty's Response to Benecard's Suppl. Statement of Material Facts ("ASRBSMF") ¶ 7, ECF No. 198-1.) On December 19, 2014, Benecard sent additional correspondence to Atlantic Specialty notifying it of Smart's December 15, 2014 correspondence and of Smart's intention to pursue claims against Benecard. (Benecard's Dec. 19, 2014 Correspondence 1, Ex. F to Bartell Cert., ECF No. 168-8; ASRMF ¶ 25.)

On April 1, 2015, Atlantic Specialty denied coverage. (Atlantic Specialty's Den. of Coverage 1, Ex. G to Bartell Cert., ECF No. 168-8; ASRMF ¶ 26.) In its correspondence denying coverage, Atlantic Specialty invoked the Managed Care Exclusion, stating "[a]ll of the allegations against Benecard result, directly or indirectly, from **Managed Care Activities**." (Atlantic Specialty's Den. of Coverage 2–3.) Its correspondence further explained that its position set forth

8

"should not be construed as a waiver of its rights under any of the provisions of the Policy or any other defenses available to it under the Policy or applicable law," "[s]pecifically, but without limitation," to its "rights under Exclusions (O), which excludes coverage for claims for breach of contract, and (K)(2), which excludes indemnity coverage for claims involving fraud or dishonesty, of Section III of the D&O coverage section." (*Id.* at 3.)

Benecard also sought defense coverage under the Allied World E&O Policy, and Allied World funded Benecard's defense of the Smart action. (ASMF ¶¶ 26–27; BRASMF ¶¶ 26–27.) In a separate action before this Court, Benecard litigates whether the Allied World E&O Policy requires Allied World to indemnify the Smart action. (Benecard's Countercl. ¶ 1, *Allied World Assurance Co. (US) Inc. v. Benecard Servs., Inc.*, No. 17-12252 (D.N.J. filed Nov. 30, 2017), ECF No. 9.) To further clarify, in this action Benecard seeks a declaratory judgment that Allied World must provide further defense coverage and indemnify the Smart action under the Allied World D&O Policy. (Am. Compl. ¶¶ 11, 67.)

### B.   Disputed Facts

Atlantic Specialty disputes Benecard's assertion that the Managed Care Exclusion does not apply to misstatements or misleading statements and that such claims are covered by the Fraud Exclusion. (BMF ¶¶ 20–21; ASRMF ¶¶ 20–21.) Atlantic Specialty rejects Benecard's claim that it "delayed for almost ten (10) months before finally denying coverage to Benecard" and contends that "Benecard first gave notice of a Claim on December 19, 2014, and Atlantic Specialty responded on April 1, 2015." (BMF ¶ 26; ASRMF ¶ 26.) Atlantic Specialty also disputes Benecard's claim that it "used a boilerplate form letter to deny Benecard coverage" and that the letter contains "[a]n entire paragraph . . . [that] deals with a policyholder other than Benecard and with a policy other than Atlantic Specialty's D&O Policy." (BMF ¶¶ 27–28; ASRMF ¶¶ 27–28.)

Benecard denies Atlantic Specialty's claims that Wells Fargo advised it that the Smart action was an E&O, not a D&O, claim and that Atlantic Specialty's denial of coverage was not a surprise to Benecard or Wells Fargo. (ASMF ¶¶ 28–29; BRASMF ¶¶ 28–29.)

## II.     PARTIES' CLAIMS

In its eleven-count Amended Complaint, Benecard seeks a declaratory judgment that Allied World, Atlantic Specialty, Travelers Property Company of America ("Travelers"), RSUI, and ACE Property & Casualty Company ("ACE") (collectively, "Defendants") must provide coverage for defense and indemnity costs arising from Smart's lawsuit against Benecard; compensatory and consequential damages arising from Allied World's, Atlantic Specialty's, and Travelers' alleged breaches of their insurance policies; and consequential damages arising from Allied World's, Atlantic Specialty's and ACE's alleged bad faith conduct. (Am. Compl. ¶ 1.) Benecard alleges:

1.      Allied World rejected its obligations under a D&O insurance policy it issued to fund Benecard's defense and pay any judgment or settlement arising from the Smart action. (Am. Compl. ¶¶ 67–68.)

2.      Atlantic Specialty rejected its obligations under a D&O insurance policy it issued to fund Benecard's defense and pay any judgment or settlement arising from the Smart action. (*Id.* ¶¶ 71–72.)

3.      RSUI failed to confirm its obligation under an Excess D&O insurance policy it issued to cover defense and indemnity costs arising from the Smart action. (*Id.* ¶¶ 75–76.)

4.      Travelers rejected its obligations under insurance policies it issued to fund Benecard's defense and pay any judgment or settlement arising from the Smart action. (*Id.* ¶¶ 79–80.)

5.      ACE failed to confirm its obligation under Excess insurance policies it issued to cover defense and indemnity costs arising from the Smart action. (*Id.* ¶¶ 83–84.)

6.      Allied World breached its contract by failing to fund Benecard's defense of the Smart action. (*Id.* ¶¶ 87–88.)

7.     Atlantic Specialty breached its contract by failing to fund Benecard's defense of the Smart action. (*Id.* ¶¶ 90–91.)

8.     Travelers breached its contract by failing to fund Benecard's defense of the Smart action. (*Id.* ¶¶ 93–94.)

9.     Atlantic Specialty breached its duty of good faith and fair dealing by, among other things, failing to (1) "act promptly upon communications regarding claims," (2) "conduct a prompt and objectively reasonable investigation of Benecard's coverage claims," and (3) "communicate promptly to Benecard the results of any such investigation." More specifically, Atlantic Specialty waited ten months before responding to Benecard's coverage request, failed to conduct an objectively reasonable investigation, and used a boilerplate form coverage declination letter. (*Id.* ¶¶ 97–98.)

10.    Allied World breached its duty of good faith and fair dealing by, among other things, (1) "refusing to accept Benecard's April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of claim," (2) "refusing to accept Benecard's April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of circumstances," and (3) "refusing to accept Benecard's April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of circumstances under Allied's D&O Policy while simultaneously treating Benecard's identical April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of circumstances under Allied's E&O Policy." (*Id.* ¶ 103.)

11.    ACE breached its duty of good faith and fair dealing by, among other things, failing to (1) "acknowledge and act reasonably promptly upon communications regarding claims," (2) "investigate promptly Benecard's coverage claims," and (3) "communicate promptly to Benecard the results of any such investigation." (*Id.* ¶ 108.)

In its Motion, Benecard seeks reimbursement of its costs of defending the Smart action. (Moving Br. 1, ECF No. 168-1.) In addition to opposing Benecard's Motion, Atlantic Specialty cross-moves for summary judgment, seeking judgment as a matter of law that the Policy's exclusions unambiguously preclude any coverage for the Smart action and, consequently, that all Benecard's claims against Atlantic Specialty—Counts II, VII, and IX—be dismissed with prejudice. (Cross Br. 1, ECF No. 175-1.) RSUI joins Atlantic Specialty's Cross-Motion, seeking summary judgment that, if there is no coverage under the Atlantic Specialty Policy, there can be no coverage under its followed-form excess policy. *Id.*

## III.   PARTIES' POSITIONS

### A.   Benecard's Moving Brief

Benecard argues the Court should grant its Motion because insurers are obligated to pay defense costs whenever the underlying claim potentially falls within a policy's coverage, (Moving Br. 8 (citing *Flomerfelt v. Cardiello*, 202 N.J. 432, 444–47 (2010))), and this Court already determined that the underlying action fell potentially within the Policy's coverage when it denied Atlantic Specialty's Federal Rule of Civil Procedure ("Rule") 12(b)(6) Motion to Dismiss Benecard's Complaint ("Atlantic Specialty's Rule 12(b)(6) Motion"), (*id.* at 8–9). Benecard contends Atlantic Specialty must advance defense costs because Smart's allegations fell potentially within the Policy's coverage, specifically, the definition of claim and wrongful act. (*Id.* at 11–14).

Turning to the exclusions, Benecard argues they are ambiguous and Atlantic Specialty must provide defense costs, regardless of whether it believes the exclusions bar coverage, because there is no provision in the Policy that reserves to Atlantic Specialty the right to make that determination ahead of advancing defense costs, and because it is for a court to decide whether any of the exclusions apply absent such right. (*Id.* at 15–16 (discussing *Associated Elec. & Gas Ins. Servs., Ltd. v. Rigas*, 382 F. Supp. 2d 685, 689, 701 (E.D. Pa. 2004)).) The Managed Care Exclusion, Benecard asserts, does not bar coverage because it applies only to "any actual or alleged error, act, [or] omission," not misstatements or misleading statements, which are addressed separately in the Policy's Fraud Exclusion. (*Id.* at 17–18 (discussing Atlantic Specialty Policy D&O Section §§ III(K), (P)).) Benecard claims "misstatement" and "misleading statement" are listed separately from "act, error, [and] omission" in the definition of "Wrongful Act" because the Policy treats them differently, and to read the former into an exclusion only using the latter would render the former superfluous. (*Id.* at 18 (discussing Atlantic Specialty Policy D&O Section §§ II(Z), III(P)).)

12

The Fraud Exclusion, Benecard adds, does not apply because it only concerns a "deliberately fraudulent . . . act . . . established by a final adjudication." (*Id.* (quoting Atlantic Specialty Policy D&O Section § III(K)).) Acknowledging the Fraud Exclusion also does not use the terms "misstatement" or "misleading statement," Benecard agrees it does not encompass such conduct. (*Id.* at 19 n.8.)

Benecard asserts that Atlantic Specialty's interpretation of the exclusions renders its coverage illusory and, if applied, would frustrate Benecard's reasonable expectations. (*Id.* at 22–23.) Benecard stresses that Atlantic Specialty knew it was in the business of providing administrative and management services for healthcare organizations and that Benecard expected the Policy to cover such services. (*Id.* at 23 (citing Drafting Notes, Ex. 1 to Bartell Cert., ECF No. 168-12)).) Atlantic Specialty's interpretation, Benecard concludes, would render its coverage inapplicable to Benecard's business entirely. (*Id.* at 24.)

### B.    Atlantic Specialty's Opposition and Moving Brief

In its procedural history section, Atlantic Specialty stresses that this Court's denial of its Rule 12(b)(6) Motion was based solely on Benecard's pleadings, and that the Court held Atlantic Specialty failed to prove an exclusion applied based on the face of Benecard's Complaint alone. (Cross Br. 7 (quoting Tr. Mot. Hr'g/Decision, at 38:4–7, Ex. G to Judge Decl., ECF No. 175-11).) Atlantic Specialty submits that this Court's decision on its Rule 12(b)(6) Motion is not dispositive, here, because the Court applies a different standard and may consider evidence beyond the pleadings, like the Policy. (*Id.* at 26–27.) Atlantic Specialty begins its argument by claiming it is undisputed that Allied World fully funded Benecard's defense under the Allied World E&O Policy and—because Benecard is moving under the Atlantic Specialty Policy only for defense coverage—Benecard's Motion should be dismissed because Benecard cannot recover defense costs twice from different insurers. (*Id.* at 10 & n.4.) Because Benecard failed to demonstrate that its defense

13

costs were beyond that covered by Allied World, Atlantic Specialty contends, Benecard's action under the Atlantic Specialty Policy is actually for indemnity coverage, which it cannot obtain because the Atlantic Specialty Policy plainly does not cover Smart's allegations. (*Id.* at 10–11.)

Discussing the exclusions, Atlantic Specialty first contends that coverage under the Policy for the Smart action is precluded by the plain, broad language of the Policy which bars coverage for any claim "*based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged* act, error or omission in the performance of, or failure to perform, Managed Care Activities." (*Id.* at 12 (quoting Atlantic Specialty Policy Directors, Officers & Organization Liability Coverage Section ("Atlantic Specialty Policy D&O Section"), at § III(P), Ex. J to Judge Decl., ECF No. 175-14).) Atlantic Specialty contends the language is unmistakably broad and the Smart action is indeed a claim that originates, grows out of, or has a substantial nexus with Benecard's alleged acts, errors, and omissions in its performance of, or failure to perform, Managed Care Activities. (*Id.* at 13.)

Atlantic Specialty argues the Smart Complaint uses the terms "misrepresentation," "omission," and "concealment," and the Managed Care Exclusion incudes the term "omission" and "act." (*Id.* at 15.) Atlantic Specialty submits "omission" subsumes "concealment" and "act" includes "misrepresentation," which is an affirmative act. (*Id.*) Atlantic Specialty argues that Benecard's claim that the Fraud Exclusion applies to misrepresentations is flawed because that exclusion also does not use the terms "misstatement" or "misleading statement," and refers only to any "act, error[,] or omission." (*Id.*) Although the Managed Care Exclusion and Fraud Exclusion potentially overlap, Atlantic Specialty explains that they address different risks. (*Id.* at 16.) The Fraud Exclusion concerns deliberate dishonesty or willful misconduct; the Managed Care Exclusion concerns claims arising out of Managed Care activities—which could include deliberate

14

dishonesty as well. (*Id.*) Of note, according to Atlantic Specialty, although Benecard argues "misrepresentations" are not "acts" here, Benecard argues that Smart's allegations of misrepresentation and concealment fall within Allied World's E&O Policy. (*Id.* at 16–17.) Even assuming "misrepresentation" is not an "act," Atlantic Specialty asserts that the Managed Care Exclusion still applies because all Smart's allegations fall within the ambit of the exclusion. (*Id.* at 17.)

Atlantic Specialty argues that its interpretation of the Policy as barring coverage of the Smart action does not render its coverage illusory because the Policy would cover numerous types of managerial or commercial claims, including alleged wrongdoing in connection with the acquisition of another company or in connection with the offering of equity or debt. (*Id.* at 24.) Atlantic Specialty contends New Jersey courts only allow the reasonable expectations of the insured to override the plain meaning of a policy in exceptional circumstances, which have rarely been found. (*Id.* at 25 (citing *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236 (3d Cir. 2006)).) Absent a clear violation of public policy, Atlantic Specialty submits, Benecard's expectations could not override the clear language of the Policy. (*Id.* at 26 (citing *Colliers Lanard & Axilbund*, 458 F.3d at 236–37).)

Finally, Atlantic Specialty argues that because the Policy cannot provide indemnity coverage, it affords no potential coverage for the Smart action. (*Id.* at 27–28.) It further argues that Benecard's bad faith claim must also fail because a determination that coverage exists for a loss is a necessary predicate to a claim for bad faith. (*Id.* at 28 (citing *Hudson Universal, Ltd. v. Aetna Ins. Co.*, 987 F. Supp. 337, 342 (D.N.J. 1997)).) Atlantic Specialty submits that New Jersey does not recognize a claim for "bad faith failure to properly investigate and communicate," and, even if

it did, its limited delay and denial two months before Smart initiated the lawsuit cannot constitute bad faith. (*Id.* at 29.)

### C. Benecard's Reply and Opposition

In addition to reasserting that the Fraud Exclusion was intended to apply to deliberately fraudulent conduct, hence the addition of the requirement of a final adjudication, Benecard adds that, even if misstatements and misrepresentations were subsumed, Smart's allegations of misrepresentation arose separately from the breach of contract claims. (Benecard's Opp'n 10–11 (discussing *Harvard Pilgrim Health Care, Inc. v. Travelers Prop. Cas. Co. of Am.*, No. SUCV201401151, 2014 WL 7506231, at *1, *3, *5 (Mass. Super. Ct. Oct. 10, 2014)), ECF No. 186.) It contends that its misrepresentations are distinct from the Managed Care Activities and thus deserving of coverage. (*Id.* at 12–13.) Benecard submits that if the Managed Care Exclusion applies to all of the purported misstatements, then the Policy provides Benecard's business no coverage at all. (*Id.* at 14.)

Benecard claims that any recovery from Atlantic Specialty will go directly to Allied World, which Benecard states funded its defense alone. (*Id.* at 19.) Benecard contends there will be no double recovery and that it is only seeking Atlantic Specialty to fund its share of the defense costs. (*Id.*) Moreover, Benecard notes that no insurance company has paid anything towards its settlement with Smart. (*Id.* at 20.)

Turning to its bad faith claim, Benecard claims New Jersey law requires insurers to investigate a possible claim within a reasonable time, and that the obligation to deal in good faith includes a duty of fair and full disclosure of the results of any investigation in a timely fashion. (*Id.* at 21 (citing *Griggs v. Bertram*, 88 N.J. 347, 360–61 (1982)).) Benecard also contends that failure to investigate is recognized by New Jersey law, (*id.* at 22 (citing *Princeton Gamma-Tech, Inc. v. Hartford Ins. Group*, No. SOM-L-1289-91, 1997 WL 35384066, at *126 (N.J. Super. Ct.

June 5, 1997))), and a different standard applies to cases of bad faith in the processing of claims, (*id.* at 23 (quoting *Pickett v. Lloyd's*, 131 N.J. 457, 481 (1993) ("In the case of denial of benefits, bad faith is established by showing that no debatable reasons existed for denial of the benefits. In the case of processing delay, bad faith is established by showing that no valid reasons existed to delay processing the claim and the insurance company knew or recklessly disregarded the fact that no valid reasons supported the delay."))).

### D.    Atlantic Specialty's Reply

Atlantic Specialty responds that the sole question for the Court is whether the underlying claim arises out of, or directly or indirectly results from Benecard's performance of, or failure to perform, Managed Care Activities. (Atlantic Specialty's Reply 1, ECF No. 198.) It argues that, because "act" subsumes affirmative misrepresentations, the Managed Care Exclusion applies. (*Id.* at 1–2 (citing Act, Merriam-Webster Dictionary, Marriam-Webster, Inc., https://www.merriam-webster.com/dictionary/act (last visited Dec. 16, 2019)).) Atlantic Specialty highlights that Benecard is seeking coverage under the Allied World E&O Policy which defines "Wrongful Act" as "any act, error, or omission," contending its misrepresentations and omissions fall within that definition. (*Id.* at 2.) Moreover, Atlantic Specialty explains, Benecard asserts the Fraud Exclusion was intended to apply, but the Fraud Exclusion uses the same language. (*Id.* at 3.) Further, the Managed Care Exclusion applies to all claims "directly or indirectly" resulting from Benecard's performance of Managed Care Activities. (*Id.* at 5.) Atlantic Specialty submits all of Smart's allegations, including those of misstatements and misrepresentations, arose out of Benecard's obligation to perform Managed Care Activities. (*Id.*)

Finally, Atlantic Specialty asserts that, absent coverage under the Policy, Benecard does not have a claim for bad faith. (*Id.* at 12–13.) Further, it contends its delay cannot legally constitute

bad faith because it only took three months for it to process the claim, and any further delay was attributable to an innocent administrative error. (*Id.* at 14.)

## IV.   **LEGAL STANDARD**

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

"In evaluating the evidence, the Court must consider all facts and their logical inferences in the light most favorable to the non-moving party." *Rhodes v. Marix Servicing, LLC*, 302 F. Supp. 3d 656, 661 (D.N.J. 2018) (citing *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002)). "While the moving party bears the initial burden of proving an absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party to 'set forth specific facts showing that there is a genuine [dispute] for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 250). "Unsupported allegations, subjective beliefs, or argument alone . . . cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019). "Thus, if the nonmoving party fails 'to make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be no genuine issue of material fact . . . .'" *Id.* (quoting *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quotation marks omitted)). "In considering the motion, the Court 'does not resolve factual disputes or make credibility determinations.'" *Rhodes*, 302 F. Supp. 3d at 661 (quoting *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995)). "When ruling on cross-motions for summary judgment, the court must consider

the motions independently, and view the evidence on each motion in the light most favorable to the party opposing the motion." *Einhorn v. Kaleck Bros.*, 713 F. Supp. 2d 417, 421 (D.N.J. 2010).

## V.   **DISCUSSION**

Interpreting an insurance contract is a legal question to be resolved by the Court. *Rena. Inc. v. Brian*, 708 A.2d 747, 756 (N.J. Super. Ct. App. Div. 1998). "In attempting to discern the meaning of a provision in an insurance contract, the plain language is ordinarily the most direct route." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008). "If the language is clear, the inquiry ends." *Id.* "If the plain language of the policy is unambiguous," the Court should "not engage in a strained construction to support the imposition of liability or write a better policy for the insured than the one purchased." *Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 129 A.3d 1069, 1075 (N.J. 2016) (internal quotation marks omitted) (quoting *Chubb Custom Ins. Co.*, 948 A.2d at 1289). However, "it is a well-established principle that insurance contracts will not be enforced if they violate public policy." *Sparks v. St. Paul Ins. Co.*, 495 A.2d 406, 411 (N.J. 1985) (citations omitted).

"[W]hen disputes arise between the insured and insurer, the duty of an insurer to defend is generally determined by a side-by-side comparison of the policy and the complaint, and is triggered when the comparison demonstrates that if the complaint's allegations were sustained, an insurer would be required to pay the judgment." *Wear v. Selective Ins. Co.*, 190 A.3d 519, 527 (N.J. Super. Ct. App. Div. 2018). "[E]xclusions in insurance policies are presumptively valid and enforceable "if they are specific, plain, clear, prominent, and not contrary to public policy." *Id.* at 528 (quoting *Flomerfelt*, 202 N.J. at 441 (further quotation omitted)).

A provision in an insurance policy that "is subject to more than one reasonable interpretation . . . is ambiguous." *Templo Fuente*, 129 A.3d at 1075. The New Jersey Supreme Court has advised that "[w]here the policy language [of an insurance policy] supports two

19

meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied." *Progressive Cas. Ins. Co. v. Hurley*, 765 A.2d 195, 202 (N.J. 2001) (quoting *Lundy v. Aetna Cas. & Sur. Co.*, 458 A.2d 106, 111 (N.J. 1983)). This approach, however, is limited to instances where "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Id.* (citations omitted). "When construing an ambiguous clause in an insurance policy, courts should consider whether clearer draftsmanship by the insurer 'would have put the matter beyond reasonable question.'" *Id.* (quoting *Doto v. Russo*, 659 A.2d 1371, 1377 (N.J. 1995)). "Far-fetched interpretations of a policy exclusion are insufficient to create an ambiguity requiring coverage." *Wear*, 190 A.3d at 528. "Neither the duty to defend nor the duty to indemnify 'exists except with respect to occurrences for which the policy provides coverage.'" *Id.* at 528–29 (quoting *Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co.*, 98 N.J. 18, 22 (1984)).

New Jersey precedent allows "the reasonable expectations of the insured to override the plain meaning of a policy in exceptional circumstances." *Colliers Lanard & Axilbund*, 458 F.3d at 236–37; *Doto*, 659 A.2d at 1377. "These exceptional circumstances are narrowly confined," and "[t]he 'reasonable expectations' doctrine applies to policy forms that have the characteristics of an adhesion contract." *Abboud v. Nat'l Union Fire Ins. Co.*, 163 A.3d 353, 358 (N.J. Super. Ct. App. Div. 2017). "Courts are more inclined to apply the doctrine in cases of personal lines of insurance obtained by an unsophisticated consumer." *Id.* "Courts may vindicate the insured's reasonable expectations over the policy's literal meaning 'if the text appears overly technical or contains hidden pitfalls, cannot be understood without employing subtle or legalistic distinctions, is obscured by fine print, or requires strenuous study to comprehend.'" *Id.* at 359 (quoting *Zacarias v. Allstate Ins. Co.*, 168 N.J. 590, 601 (2001) (citations omitted) (rejecting "reasonable

expectations" argument because the policy language was "not so confusing that the average policyholder cannot make out the boundaries of the coverage," nor was an "entangled and professional interpretation of an insurance underwriter . . . pitted against that of an average purchaser of insurance" (internal quotation marks and citation omitted))). "In assessing whether the expectations are objectively reasonable, a court will consider communications regarding the coverage between the insured or its broker and the insurer or its agent that relate to the insured's expectations." *Id.* "A court must also consider whether the scope of coverage is so narrow that it 'would largely nullify the insurance' and defeat the purpose for which it was obtained." *Id.* (quoting *Sparks*, 100 N.J. at 337–39).

## A.   Benecard's Motion for Partial Summary Judgment

As a preliminary matter, the Court rejects Benecard's argument that its ruling on Atlantic Specialty's Rule 12(b)(6) Motion is dispositive of coverage under the Policy. The Court's ruling was limited to the pleadings—which did not contain the exclusions, (*see generally*, Compl., ECF No. 1)—and the Court noted in its ruling that Atlantic Specialty's arguments were better suited for the summary judgment stage, (Tr. Mot. Hr'g/Decision, at 36:15–19, 39:1–11).[1] The Court turns to the application of the Policy's exclusions in the first instance.

The Court begins by looking to the plain language of the Policy to determine whether Benecard is entitled to an advance of defense costs. If there is no potential coverage under the Policy, then there is no obligation of the insurer to advance defense costs. *See G-I Holdings Inc. v. Reliance Ins. Co.*, No. 00-6189, 2006 WL 776809, at *2 (D.N.J. Mar. 24, 2006) ("[A]n insurer's

---

[1] The Court also notes that Benecard, in opposing Atlantic Specialty's Rule 12(b)(6) Motion, argued "[t]he Insurers' exclusion-based Affirmative Defenses do not clearly appear on the face of Benecard's pleading," so "this Court should deny the Insurers' motions." (Benecard's Opp'n to Atlantic Specialty's Rule 12(b)(6) Mot. 12, ECF No. 37 (internal quotation marks and alterations omitted).)

duty to defend is determined by comparing the allegations in the underlying complaint with the language of the policy at issue.").[2] The Policy's Managed Care Exclusion bars coverage of claims "based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged act, error or omission in the performance of, or failure to perform, Managed Care Activities." (Atlantic Specialty Policy D&O Section § III(P) (emphasis omitted).) "Managed Care Activities" include "Provider Selection; Utilization Review; advertising, marketing, selling, or enrollment for . . . prescription drug [plans], . . . and services or activities performed in the administration or management of . . . prescription drug . . . plans." (*Id.* § II(M) (emphasis omitted).) "Utilization Review" is defined as "the process of evaluating the appropriateness, necessity or cost of Medical Services provided or to be provided by an Insured or for purposes of determining whether payment or coverage for such Medical Services will be authorized or paid for under any . . . prescription drug . . . plans." (*Id.* § II(Y) (emphasis omitted).) In administering Smart's Medicare Part D plan, Smart alleged Benecard was tasked with

> (1) handling all matters related to member enrollment; (2) managing the plan formulary and adjudicating member claims for coverage at the point of sale; (3) administering the coverage determination, appeal, and grievance process; (4) providing Smart with real-time, online access to Benecard's prescription drug claims database and system; (5) running the call center and answering member

---

[2] To the extent Benecard argues defense costs must be advanced before the Court can consider the Policy's exclusions, the Court disagrees and finds Benecard's reliance on *Rigas* misplaced. In applying Pennsylvania law, the United States District Court for the Eastern District of Pennsylvania closely considered the language of the policy at issue and determined—based on the language of the two exclusions discussed—that by the terms of those exclusions the insurer was required to advance defense costs absent a determination by a court on key elements of the exclusions. *Rigas*, 382 F. Supp. 2d at 698–700; *see also Simonetti v. Selective Ins. Co.*, 859 A.2d 694, 700 (N.J. Super. Ct. App. Div. 2004) (reversing summary judgment because factual question as to the cause of damages precluded application of a policy exclusion).

> questions; and (6) complying with federal law and CMS requirements.

(Smart's Compl. ¶ 19.) Comparing the terms of the exclusions to Smart's allegations, the Court finds that Benecard was engaged in Managed Care Activities.

By its terms then, the Managed Care Exclusion would bar coverage for any claim "arising out of, directly or indirectly resulting from, . . . or in any way involving any actual or alleged act, error or omission in the performance of, or failure to perform, Managed Care Activities." (Atlantic Specialty Policy D&O Section § III(P) (emphasis omitted).) Smart's contract claims, then, are not covered under the Policy because the claims plainly arise from Benecard's agreement with Smart to provide Managed Care services and Smart's claim was based on Benecard's alleged failure to perform its obligations. The remaining question for the Court is whether the Managed Care Exclusion encompasses Smart's other allegations, namely its claims of fraudulent misrepresentation or omission and fraudulent concealment. (Smart's Compl. ¶¶ 92, 101–05.)

Benecard argues reading "misrepresentation" or "misstatement" into the Managed Care Exclusion would render them superfluities in the Policy's definition of "Wrongful Act," which lists, separately, "any actual or alleged act, error, omission, misstatement, misleading statement[,] or breach of duty." (Atlantic Specialty Policy D&O Section § II(Z).) Benecard claims the intent of the Policy was to have fraudulent conduct like "misrepresentations" limited to the Fraud Exclusion. The Fraud Exclusion, however, uses the same, yet more general language: "act or omission." (*Id.* § III(K).) Neither the Managed Care Exclusion nor the Fraud Exclusion uses the terms "misstatement" or "misleading statement," and instead use the phrase "acts, errors or omissions." (*Id.* §§ III(K), (P).) In effect, Benecard asks the Court to read "misrepresentation" or "misstatement" as limited to fraudulent misrepresentations or misstatements. Benecard's interpretation would create an unusual exception in Policy, whereby it would deny coverage for

any act, error, or omission arising out of Managed Care Activities, except for "misstatements" or "misleading statements," unless the statement was established by a final adjudication as fraudulent. This would mean all other acts, errors, or omissions arising out of Benecard's Managed Care Activities would be exempt from coverage except negligent misrepresentations or misrepresentations not yet proven fraudulent. *See Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1196 (N.J. 2000) (noting negligent misrepresentation is easier to prove because it does not require scienter). Such a strained reading of the Policy is unsustainable.

Benecard acknowledges that "misstatements" or "misleading statements" must be read as "acts" in the Fraud Exclusion. Benecard explains the Fraud Exclusion "bars coverage for a claim against Benecard for 'the committing of any deliberately fraudulent . . . *act*,'" and "applies only if 'the deliberately fraudulent . . . *act* . . . has been established by a final adjudication.'" (Moving Br. 18–19 & n.8 (quoting Atlantic Specialty Policy D&O Section § III(K)) (omissions in original) (emphasis added).) The Policy's language is unmistakably broad, including "any . . . alleged act, error[,] or omission." (*Id.* § III(P).) The Court agrees that misstatements and misrepresentations are "acts" and that the Managed Care Exclusion applies to Smart's claims for fraudulent misrepresentation or omission and fraudulent concealment. The Policy is not subverted by reading misstatements and misrepresentations as "acts," especially where the alternative proposal would lead to an absurd result. Further, the Court notes that the Managed Care Exclusion not only applies to claims "arising out of" Managed Care Activities—language given broad effect by New Jersey courts, *see Mem'l Properties, LLC v. Zurich Am. Ins. Co.*, 46 A.3d 525, 535 (N.J. 2012)—but also any claim "directly or indirectly resulting from, in consequence of, or in any way involving" Managed Care Activities, (Atlantic Specialty Policy D&O Section § III(P)).

The Court finds that reading the Policy to exclude coverage for the Smart action does not provide Benecard illusory insurance coverage nor contravene New Jersey's policy against such coverage. The Managed Care Exclusion is limited to claims "in any way involving any actual or alleged act, error or omission *in the performance of, or failure to perform,* **Managed Care Activities**." (Atlantic Specialty Policy D&O Section § III(P) (emphasis added).) Assuming Benecard only performs Managed Care services, the exclusion bars coverage from claims involving the performance of Benecard's commercial services—not "any claim relevant to its business." (Moving Br. 24.) Beyond its assertion that applying the Managed Care Exclusion would render the Policy illusory, Benecard proffers nothing to shed light on why it obtained the Policy in the first place, nor does it point to an alleged misunderstanding in purchasing the Policy. *See Abboud*, 163 A.3d at 358. This is particularly curious considering Benecard also obtained E&O coverage. Atlantic Specialty submits the Policy would cover wrongdoing in connection with a merger or acquisition, claims involving the offering of an equity or debt, defense coverage for directors or officers indicted for stealing from Benecard or others, and myriad other claims against directors or officers arising from commercial transactions. (Cross Br. 24–25; Atlantic Specialty's Reply 11.) Atlantic Specialty further submits that those "are the very risks for which D&O coverage is generally sought, not the risk of claims by customers." (Atlantic Specialty's Reply 11.) The Court concludes that application of the Managed Care Exclusion as written does not render its coverage illusory simply because it does not apply to claims arising out of the performance of Managed Care Activities. The Court will not override the plain language of the Policy and extend coverage to an occurrence which was explicitly carved out. *See Formosa Plastics Corp., U.S.A. v. Ace Am. Ins. Co.*, No. 06-5055, 2010 WL 4687835, at *17 (D.N.J. Nov. 9, 2010).

Accordingly, based on the plain language of the Policy, specifically the Managed Care Exclusion, the Court finds there is no potential coverage under the Atlantic Specialty Policy. Benecard's Motion for Partial Summary Judgment is denied.

### B.      Atlantic Specialty's Motion for Summary Judgment

Having determined as a matter of law that the Managed Care Exclusion unambiguously applies to Smart's allegations and that there is no potential coverage under Atlantic Specialty's Policy for that action, the Court concludes there can be no indemnity coverage under the Policy and grants Atlantic Specialty's Motion for Summary Judgment on Counts II and VII.

The Court now turns to Benecard's claim that Atlantic Specialty acted in bad faith by, among other things, failing to (1) "act promptly upon communications regarding claims," (2) "conduct a prompt and objectively reasonable investigation of Benecard's coverage claims," and (3) "communicate promptly to Benecard the results of any such investigation." (Am. Compl. ¶¶ 97–98.)

"[O]nce an insurer has had a reasonable opportunity to investigate, or has learned of grounds for questioning coverage, it then is under a duty promptly to inform its insured of its intention to disclaim coverage or of the possibility that coverage will be denied or questioned." *Griggs v. Bertram*, 443 A.2d 163, 168 (1982). "[A]n insurer's unreasonable delay in asserting its right to deny a claim can estop the insurer from disclaiming coverage, even for a claim that would fall outside the policy." *Fed. Ins. Co. v. Cherokee Ardell, L.L.C.*, No. 08-2581, 2011 WL 1254036, at *18 (D.N.J. Mar. 28, 2011). Benecard does not seek to estop Atlantic Specialty from denying coverage, but instead seeks damages for Atlantic Specialty's delay and alleged failure to conduct an investigation.

"Under the 'fairly debatable' standard, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert

a claim for an insurer's bad-faith refusal to pay the claim." *Pickett*, 621 A.2d at 454. "A more difficult application of the standard arises when the issue involves not a denial or refusal to pay a claim but, as here, inattention to payment of a *valid, uncontested claim*." *Id.* (emphasis added). "In the case of processing delay, bad faith is established by showing that no valid reasons existed to delay processing the claim and the insurance company knew or recklessly disregarded the fact that no valid reasons supported the delay." *Id.* at 457–58. "In either case (denial or delay), liability may be imposed for consequential economic losses that are fairly within the contemplation of the insurance company." *Id.* Whether arising under a denial of coverage or a delay in processing a claim, "the test appears to be essentially the same." *Id.* at 454. Because Atlantic Specialty's Policy does not provide coverage for the Smart action, Benecard cannot recover consequential damages for Atlantic Specialty's alleged bad faith delay. Consequently, the Court grants Atlantic Specialty's Cross-Motion for Summary Judgment on Count IX.

### C.    RSUI's Excess Policy

A "follow form" excess policy is a policy in which the coverage issues in the excess policy turn solely on the interpretation of the underlying primary policy. *See Houbigant, Inc. v. Fed. Ins. Co.*, 374 F.3d 192, 203 (3d Cir. 2004). Because the Court holds the Atlantic Specialty Policy does not provide coverage for the Smart action, Benecard cannot recover under its Excess Liability Policy. The Court, therefore, grants RSUI's Motion with respect to whether RSUI Policy No. HS657057 affords coverage to Benecard for the underlying action.

## VI.    **CONCLUSION**

For the reasons stated above, Benecard's Motion for Partial Summary Judgement is denied, and Atlantic Specialty's Cross-Motion for Summary Judgment is granted. All claims as to Atlantic Specialty (Counts II, VII, and IX) are dismissed with prejudice. RSUI's Motion is granted, in part, and Count III—to the extent Benecard seeks coverage under Excess Liability Policy Number

HS657057—is dismissed with prejudice. An order consistent with this Memorandum Opinion will be entered.

s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE