<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| BENECARD SERVICES, INC.,<br><br>           Plaintiff,<br><br>           v.<br><br>ALLIED WORLD SPECIALTY<br>INSURANCE COMPANY f/k/a DARWIN<br>NATIONAL ASSURANCE COMPANY,<br>et al.,<br><br>           Defendants. | Civil Action No. 15-8593 (MAS) (TJB)<br><br>**MEMORANDUM OPINION** |

<u>**SHIPP, District Judge**</u>

This matter comes before the Court upon Plaintiff Benecard Services Inc.'s ("Benecard") Motion for Partial Summary Judgment Against Defendant Allied World Specialty Insurance Company ("Allied World") (the "Motion") (ECF No. 170), and Allied World's Opposition to Benecard's Motion and Cross-Motion for Summary Judgment (the "Cross-Motion") (ECF No. 174). Defendant RSUI Indemnity Company ("RSUI") joined in the Cross-Motion "with respect to whether RSUI Policy No. HS651201 affords coverage to [Benecard] for the Underlying Action." (ECF No. 178.) Benecard opposed Allied World's Cross-Motion (ECF No. 187), and Allied World replied (ECF No. 197). RSUI joined sections I, II, III, and VI of Allied World's Reply. (ECF No. 199.) The Court has carefully considered the parties' arguments and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Benecard's Motion for Partial Summary Judgement is denied and Allied World's Cross-Motion for Summary Judgment is granted. All claims as to Allied World (i.e., Counts I, V, and X) are

dismissed with prejudice. RSUI's Motion is granted in part, and Count III, to the extent Benecard seeks coverage under Excess Liability Policy Number HS651201, is dismissed with prejudice.

## I.    BACKGROUND

### A.    Undisputed Facts

#### 1.    The Smart Action

In 2012, Smart Insurance Company ("Smart") was approved by the Centers for Medicare and Medicaid Services ("CMS") to act as a Medicare Part D plan sponsor. (Benecard's Statement of Material Facts Against Allied World ("BMF") ¶ 1, ECF No. 170-2 (citing Smart's Compl. ¶ 24, Ex. A to Bartell Cert., ECF No. 170-4); Allied World's Responsive Statement of Material Fact ("AWRMF") ¶ 1, ECF No. 174-3.) Benecard agreed to provide Smart with certain services in connection with the Part D plan. (BMF ¶ 2 (citing Smart's Compl. ¶¶ 16–19); AWRMF ¶ 2.) Smart alleged that Benecard was tasked with (1) handling all matters related to member enrollment; (2) managing the plan formulary and adjudicating member claims for coverage at the point of sale; (3) administering the coverage determination, appeal, and grievance process; (4) providing Smart with real-time, online access to Benecard's prescription drug claims database and system; (5) running the call center and answering member questions; and (6) complying with federal law and CMS requirements. (Smart's Compl. ¶ 19.)

On April 23, 2013, after auditing the plans, CMS sanctioned Smart, suspending enrollment in and marketing of the plans. (BMF ¶ 3 (citing Smart's Compl. ¶ 50); AWRMF ¶ 3.) The day before CMS imposed sanctions, Smart wrote to Benecard advising it that "a dispute between Smart and Benecard is a likelihood," and asking Benecard to "preserv[e] the documents relevant to the parties' relationship" and to "take whatever other actions are necessary to preserve status quo and protect the parties' respective rights and obligations." (BMF ¶¶ 5–6 (quoting Smart's Apr. 22, 2014 Correspondence, Ex. B to Bartell Cert., ECF No. 170-5); AWRMF ¶¶ 5–6.)

2

On October 10, 2013, Smart and Benecard executed a "Transition Agreement," requiring the parties to notify each other of their intent to pursue claims and non-binding mediation between seventy-five and eighty-five days after CMS completed its reconciliation of the 2013 Part D Plan Year. (Allied World's Statement of Material Facts ("AWMF") ¶ 16, ECF No. 174-2 (quoting Smart's Compl. ¶¶ 78–79, Ex. A to Simpson Cert., ECF No. 174-5); Benecard's Response to Allied World's Statement of Material Facts ("BRMF") ¶ 16, ECF No. 187-1.) Smart sold the plans in August 2013 and, on December 15, 2014, advised Benecard that it "intend[ed] to pursue claims against [it] for, among other things, breach of contract and fraud." (Smart's Compl. ¶ 74; Smart's Dec. 15, 2014 Correspondence, Ex. C to Bartell Cert., ECF No. 170-6; BMF ¶¶ 4, 7 (quoting in part Smart's Dec. 15, 2014 Correspondence); AWRMF ¶¶ 4, 7.)

On April 23, 2015, Smart and Benecard participated in mediation. (AWMF ¶ 19; BRMF ¶ 19.) After mediation failed, on June 8, 2015, Smart filed suit against Benecard in the United States District Court for the Southern District of New York, (BMF ¶ 8; AWRMF ¶ 8; AWMF ¶ 19; BRMF ¶ 19), alleging claims "aris[ing] out of the failure of Benecard to perform its contractual obligation to manage Smart's Medicare Part D Prescription Drug plans," and "out of a number of intentionally false representations and material omissions that Benecard made to convince Smart not to terminate their contract," (Smart's Compl. ¶ 1). Smart asserted two counts: (1) breach of contract and (2) fraudulent misrepresentation, omission, or concealment. (*Id.* ¶¶ 86, 95–105.)

Beginning with the contractual failures, (*id.* ¶¶ 27, 54–55), Smart alleged that,

> [a]fter the Plans were launched on January 1, 2013, Smart's monitoring efforts uncovered a number of problems with Benecard's performance, including but not limited to: (a) its failure to properly handle and process a number of beneficiary enrollment requests, (b) its failure to provide required information to beneficiaries in a timely manner, (c) its failure to provide a toll-free claims service to answer general program questions and specific inquiries from beneficiaries, providers and pharmacies, (d) its

3

> failure to provide proper notice to Smart of certain compliance
> issues and (e) its improper rejection of claims at the point-of-sale.

(*Id.* ¶ 33.) Smart claimed that its supervision of Benecard's efforts to redress those problems "were thwarted by Benecard's . . . efforts to conceal the true nature and extent of its problems from Smart." (*Id.* ¶ 35.) According to Smart, Benecard knew even before the launch date that it was not going to be ready to process claims or handle coverage determination requests, appeals, and grievances, and that significant problems were going to occur on launch. (*Id.* ¶ 38.) Nevertheless, Smart alleged, Benecard "concealed the information," and "Benecard's senior management, including Chief Executive Officer Michael Perry, instructed Benecard's staff to make sure Smart falsely believed Benecard would be ready to launch the Plans by January 1[, 2013]." (*Id.*) Smart claimed Benecard ignored its corrective efforts, refused assistance, and spurned Smart's repeated requests for real-time access to its systems until the eve of CMS's audit. (*Id.* ¶¶ 39–42.)

Smart also alleged that, after CMS's audit identified several problems with Benecard's system, including the improper denial of prescription drug coverage at the point of sale, "Benecard represented to Smart that it had fixed the identified problems." (*Id.* ¶ 47.) According to Smart, CMS's sampling of claims showed Benecard had not fixed many of the issues and identified ten new deficiencies. (*Id.*) As a result, CMS imposed sanctions, including prohibiting new member enrollment and marketing, which Smart alleged cost it "tens of thousands of new members and millions of dollars." (*Id.* ¶ 50.)

Smart further alleged that Benecard "made a number of false representations and material omissions" "and concealed critical information from Smart, knowingly and intentionally and with the goal of ensuring that Smart did not terminate the Agreement." (*Id.* ¶¶ 56–57.) As an example, Smart alleged that "Benecard representatives, including Michael Perry, represented to Smart throughout the last quarter of 2012 that Benecard would be ready to handle its claim processing

responsibilities and coverage determination, appeal and grievance processing responsibilities on January 1, 2013," but that "Benecard knew these representations were false," and "Perry instructed his staff to conceal from Smart that Benecard would not be ready and that it was falling further and further behind schedule." (*Id.* ¶ 58.) Smart further alleged that Benecard's senior personnel instructed its employees to ignore Smart's corrective action plans, that Benecard assigned untrained personnel to its call center after telling Smart it would rapidly increase the number of properly trained staff, and that Benecard's Chief Operating Officer told employees its system was proprietary and that Smart would not be given access to it after repeatedly representing to Smart that it would be given real-time online access. (*Id.* ¶¶ 59–61.)

Smart asserted that, "[w]hen Benecard made these misrepresentations and omissions to Smart, it knew they were false, or, alternatively, it made them recklessly and without knowledge as to their truth or falsity," that Benecard "knew it was concealing information that was material to Smart in determining whether to terminate the Agreement" and "made these statements and omissions with the intention of Smart relying on them, with the intent to deceive Smart or with reckless disregard." (*Id.* ¶¶ 97–99.) Smart claimed that, "[i]f Benecard had not made these misrepresentations and omissions, and if Smart had been aware of the true nature and depth of the problems at Benecard, Smart would have terminated the Agreement, switched to a new [pharmacy benefit manager] much earlier and saved its Plans from further damage." (*Id.* ¶ 69.) Smart asserted it had been damaged as a result of Benecard's misrepresentations, omissions, and concealment. (*Id.* ¶ 104.) Benecard and Smart settled in September 2016. (BMF ¶ 12; AWRMF ¶ 12.)

### 2. Benecard's Insurance Policies

Benecard purchased from Allied World a Forcefield Private Company Management Liability Package Policy (the "Allied World D&O Policy," or the "Policy"). (BMF ¶ 13 (citing Allied World D&O Policy, Ex. E to Bartell Cert., ECF No. 170-8); AWRMF ¶ 13.) The Allied

World D&O Policy incepted on April 12, 2013 and originally expired on April 12, 2014. (BMF

¶ 14; AWRMF ¶ 14.) Endorsement 17 extended the Policy's expiration date to April 30, 2014.

(BMF ¶ 15; AWRMF ¶ 15.) Pursuant to the terms of the Policy,

> The **Insurer** shall pay on behalf of the **Company** the **Loss** arising
> from a **Claim**, first made during the **Policy Period** (or Discovery
> Period, if applicable) against the **Company** for any **Wrongful Act**,
> and reported to the **Insurer** in accordance with Section V. of the
> General Terms and Conditions.

(Allied World D&O Policy at AW93.) "Claim" is defined, in pertinent part, to mean "any written

demand for monetary, non-monetary[,] or injunctive relief made against an **Insured**" or "judicial,

administrative[,] or regulatory proceeding, whether civil or criminal, for monetary, non-

monetary[,] or injunctive relief commenced against an **Insured**." (*Id.* at AW95.) "Wrongful Act"

is defined in the Policy as, "with respect to the **Company**, any actual or alleged act, error, omission,

neglect, breach of duty, misstatement[,] or misleading statement by the **Company**." (*Id.* at

AW100.) The Policy obligates Allied World to pay defense costs under certain circumstances.

(BMF ¶ 18; AWRMF ¶ 18.) It also contains a "Notice of Circumstances" provision that states:

> If during the **Policy Period** an **Insured** shall become aware of any
> circumstances which may reasonably be expected to give rise to a
> **Claim** being made against an **Insured** and shall, during the **Policy
> Period,** give written notice to the **Insurer** at either the physical or
> email address indicated in Item 7. of the Declarations, of the
> circumstances, including the **Wrongful Act,** allegations anticipated,
> and the reasons for anticipating such a **Claim,** with full particulars
> as to dates, persons and entities involved, any **Claim** that is
> subsequently made against the **Insured** alleging, arising out of,
> based upon or attributable to such circumstances, shall be deemed
> to have been made at the time written notice of such circumstances
> was first given to the **Insurer.**

(Allied World D&O Policy, at AW87.)

6

The Allied World D&O Policy includes two endorsements and three exclusions that limit coverage which are relevant here. The first is Endorsement 5 (the "Third-Party Services Exclusion"), which provides:

> No coverage will be available for **Loss** from any **Claim** based upon, arising out of, directly or indirectly resulting from, in consequence of or in any way involving any actual or alleged act, error, omission, misstatement, misleading statement or breach of duty in connection with the rendering of, or failure to render, services to a third party, whether or not a fee for such services has been paid . . . .

(*Id.* at AW49.) The second is Endorsement 11 (the "Insurance Company E&O Exclusion"), which states:

> This Coverage Section shall not cover any **Loss** in connection with any **Claim** arising out of, based upon, or attributable to the rendering of or failure to render professional services by any **Insured,** whether or not such services are rendered for a fee. Such professional services include, but are not limited to, the underwriting of insurance policies or reinsurance contracts; the handling and adjusting of claims arising under an insurance policy or reinsurance contract; risk management services; safety inspection and loss control services; premium financing services; insurance consulting; and any advice provided by any **Insured** with respect to these services . . . .

(*Id.* at AW58.) An amendment to the Policy contains another exclusion (the "Contract Liability Exclusion") that bars coverage for claims "based upon, arising from, or in consequence of any actual or alleged liability of any **Insured** under any express contract or agreement; provided, however, that this Exclusion shall not apply to: (1) the extent that such **Insured** would have been liable in the absence of such contract or agreement." (*Id.* at AW61.) It also contains the following exclusions (the "Deliberate Act Exclusion" and the "Professional Services Exclusion," respectively) for any claim

> arising out of, based upon or attributable to any deliberate criminal or deliberate fraudulent act or any willful violation of law by an

7

> **Insured,** if a final judgment or adjudication establishes that such act
> or violation occurred[,]

(*id.* at AW100), and for any claim

> alleging, arising out of, based upon or attributable to or in any way
> relating to the rendering or failure to render any professional
> services, whether or not registration or a license is required by the
> federal, state[,] or applicable local government; provided, however,
> that this Exclusion shall not apply to **Claims** alleging **Wrongful
> Acts** by an **Insured** in providing or failing to provide educational
> services[,]

(*id.* at AW62). Lastly, the Policy contains an exclusion (the "Fraud Exclusion") that exempts

coverage for claims "arising out of, based upon[,] or attributable to the gaining of any profit or

financial advantage by an **Insured,** if a final judgment or final adjudication in the underlying

proceeding establishes that such **Insured** was not legally entitled to such profit or advantage." (*Id.*

at AW72.)

Benecard purchased a second policy from Allied World, a Managed Care Organization

Errors and Omissions Liability Policy, effective April 12, 2014 through April 12, 2015 (the "Allied

World E&O Policy"). (BMF ¶ 25; AWRMF ¶ 25.) Allied World participated in Benecard's defense

of the Smart action and paid defense costs under the Allied World E&O Policy in the amount of

about $3.8 million. (BMF ¶ 26; AWRMF ¶ 26; AWMF ¶ 30; BRMF ¶ 30.)

Benecard also purchased an Excess Liability Policy from RSUI. (Excess Liability Policy,

Ex. A to Droughton Decl., ECF No. 178-2.) The Excess Liability Policy is a "followed-form"

policy, providing excess coverage above the underlying policy. (*Id.* at RSUI408, 415.) The

underlying policy followed by the Excess Liability Policy is the Allied World D&O Policy. (*Id.* at

RSUI408; BMF ¶ 13.)

On April 30, 2014, the last day of the Policy Period, Benecard notified Allied World of,

and attached, Smart's April 22, 2014 correspondence advising Benecard a dispute between them

was likely. (BMF ¶ 28; AWRMF ¶ 28; Benecard's Apr. 30, 2014 D&O Correspondence 1, 3, Ex. H to Bartell Cert., ECF No. 170-11.) By correspondence dated May 9, 2014, Allied World informed Benecard that it could not "accept this matter as a notice of potential claim under the [Allied World D&O] Policy" because "the April 22 letter makes only passing reference to an agreement between Benecard and Smart Insurance Company and surmises that, given certain unspecified events that have transpired over the last two years, a dispute is a likelihood." (Allied World's May 9, 2014 Correspondence 2, Ex. I to Bartell Cert., ECF No. 170-12.) The May 9 correspondence further explains that the April 22 correspondence "does not identify 'the circumstances, including the **Wrongful Act,** allegations anticipated, and the reasons for anticipating [a] **Claim,** with full particulars as to dates, persons and entities involved," and "[a]ccordingly, the submittal fails to satisfy the requirements of the [Notice of Circumstances] provision and cannot be accepted by Allied World as a notice of potential claim." (*Id.*) Allied World, however, accepted identical notice under the Allied World E&O Policy. (Allied World's June 9, 2014 Correspondence 2, Ex. K to Bartell Cert., ECF No. 170-14. *Compare* Benecard's Apr. 30, 2014 E&O Correspondence 1, 3, Ex. J to Bartell Cert., ECF No. 170-13, *with* Benecard's Apr. 30, 2014 D&O Correspondence 1, 3 (using identical language in informing Allied World of a potential claim).)

On December 19, 2014, Benecard sent correspondence to Allied World advising it of Smart's December 15, 2014 correspondence and its intention to pursue claims against Benecard. (Benecard's Dec. 19, 2014 Correspondence 1, Ex. L to Bartell Cert., ECF No. 170-15.) By e-mail message, Allied World asked Benecard, "[W]ould you please be able to verify by return [e-mail] . . . that you are not submitting the claim for coverage under the above Allied World D&O policy?" (Mar. 2015 E-mail Messages 2, Ex. G to Simpson Cert., ECF No. 174-11.) Benecard responded,

9

> Based on your coverage position—that the event we reported did
> not qualify as a 'potential claim[,'] we did place the subsequent
> D&O policy on notice of this situation. However, we have not yet
> received their coverage position. If they confirm coverage, we
> would not be submitting the claim under your policy.

(*Id.* at 1.) On April 21, 2015, Benecard asked Allied World to review coverage under the Allied

World D&O Policy. (Apr. 2015 E-mail Messages 1, Ex. 1 to Simpson Cert., ECF No. 174-13.)

On April 30, 2015, Allied World denied coverage under the Allied World D&O Policy.

(Allied World's Apr. 30, 2014 Correspondence 2, Ex. M to Bartell Cert., ECF No. 170-16.) In the

correspondence, Allied World explained, "[a]ssuming for purposes of our analysis only that the

December 15, 2014 letter constitutes a **Claim** under the Policy insofar as it constitutes a 'demand

for arbitration,' such **Claim** was not made until more than 7 months after the expiration of the

**Policy Period.**" (*Id.* at 3.)

Atlantic Specialty issued a Healthcare Organization Management Liability Policy (the

"Atlantic Specialty D&O Policy") to Benecard, effective from the expiration of the Allied World

D&O Policy on April 30, 2014 through April 12, 2015. (AWMF ¶ 43; BRMF ¶ 43.) Benecard

sought coverage under the Atlantic Specialty D&O Policy, and on April 1, 2015, Atlantic Specialty

denied coverage. (AWMF ¶ 44; BRMF ¶ 44.) In its correspondence denying coverage, Atlantic

Specialty invoked the Managed Care Exclusion, stating "[a]ll of the allegations against Benecard

result, directly or indirectly, from **Managed Care Activities.**" (Atlantic Specialty's Denial of

Coverage 1, 3, Ex. G to Bartell Cert., ECF No. 168-10.) Its correspondence further advised that its

position set forth in the letter "should not be construed as a waiver of its rights under any of the

provisions of the Policy or any other defenses available to it under the Policy or applicable law."

(*Id.* at 3.)

## B.     Disputed Facts

Benecard disputes that it finalized the Smart settlement without Allied World's consent "because at that time, Allied [World] had exhausted its E&O Policy limits, and Allied [World] solicited no request for consent after receiving notice of the settlement-in-principle several times before the parties finalized the settlement." (AWMF ¶ 21; BRMF ¶ 21.)

## II.     PARTIES' CLAIMS

In its eleven-count Amended Complaint, Benecard seeks a declaratory judgment that Allied World, Atlantic Specialty, Travelers Property Company of America ("Travelers"), RSUI, and ACE Property & Casualty Company ("ACE") (collectively, "Defendants") must provide coverage for defense and indemnity costs arising from Smart's lawsuit against Benecard; compensatory and consequential damages arising from Allied World's, Atlantic Specialty's, and Travelers's alleged breaches of their insurance policies; and consequential damages arising from Allied World's, Atlantic Specialty's and ACE's alleged bad faith conduct. (Am. Compl. ¶ 1, ECF No. 57.) Benecard alleges:

1.     Allied World rejected its obligations under the D&O insurance policy it issued to fund Benecard's defense and pay any judgment or settlement arising from the Smart action. (Am. Compl. ¶¶ 67–68.)

2.     Atlantic Specialty rejected its obligations under the D&O insurance policy it issued to fund Benecard's defense and pay any judgment or settlement arising from the Smart action. (*Id.* at ¶¶ 71–72.)

3.     RSUI failed to confirm its obligation under the Excess D&O insurance policy it issued to cover defense and indemnity costs arising from the Smart action. (*Id.* at ¶¶ 75–76.)

4.     Travelers rejected its obligations under insurance policies it issued to fund Benecard's defense and pay any judgment or settlement arising from the Smart action. (*Id.* at ¶¶ 79–80.)

5.     ACE failed to confirm its obligation under Excess insurance policies it issued to cover defense and indemnity costs arising from the Smart action. (*Id.* at ¶¶ 83–84.)

11

6.   Allied World breached its contract by failing to fund Benecard's defense of the Smart action. (*Id.* at ¶¶ 87–88.)

7.   Atlantic Specialty breached its contract by failing to fund Benecard's defense of the Smart action. (*Id.* at ¶¶ 90–91.)

8.   Travelers breached its contract by failing to fund Benecard's defense of the Smart action. (*Id.* at ¶¶ 93–94.)

9.   Atlantic Specialty breached its duty of good faith and fair dealing by, among other things, failing to (1) "act promptly upon communications regarding claims," (2) "conduct a prompt and objectively reasonable investigation of Benecard's coverage claims," and (3) "communicate promptly to Benecard the results of any such investigation." More specifically, Atlantic Specialty waited ten months before responding to Benecard's coverage request, failed to "conduct an objectively reasonable investigation . . . as evidenced by (among other things) . . . use of a boilerplate form coverage declination letter." (*Id.* at ¶¶ 97–98.)

10.  Allied World breached its duty of good faith and fair dealing by, among other things, (1) "refusing to accept Benecard's April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of claim," (2) "refusing to accept Benecard's April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of circumstances," and (3) "refusing to accept Benecard's April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of circumstances under Allied [World]'s D&O Policy while simultaneously treating Benecard's identical April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of circumstances under Allied [World]'s E&O Policy." (*Id.* at ¶ 103.)

11.  ACE breached its duty of good faith and fair dealing by, among other things, failing to (1) "acknowledge and act reasonably promptly upon communications regarding claims," (2) "investigate promptly Benecard's coverage claims," and (3) "communicate promptly to Benecard the results of any such investigation." (*Id.* at ¶ 108.)

Benecard moves for summary judgment, seeking reimbursement of costs in defending the Smart action. (Moving Br. 1, ECF No. 170-1.) Allied World cross-moves for summary judgment, seeking judgment as a matter of law that there is no coverage provided by the Allied World D&O Policy for the Smart action because a claim was not made within the policy period and pursuant to the Policy's exclusions. (Cross Br. 1–2, ECF No. 174-1.) Allied World asks the Court to dismiss with prejudice all Benecard's claims against it (Counts I, VI, X). (*Id.* at 2.) In joining Allied World's Cross-Motion, RSUI also seeks summary judgment that its Excess Policy No. HS651201

provides no coverage for the Smart action. (RSUI's Notice of Mot. 2, ECF No. 178; RSUI's Oct. 7, 2019 Correspondence 1–2, ECF No. 178-4.)

## III.   PARTIES' POSITIONS

### A.   Benecard's Moving Brief

Benecard argues the Allied World D&O Policy requires Allied World to advance defense costs because the Smart action meets the coverage elements. (Moving Br. 12.) Benecard contends "Smart's April 22, 2014 letter constitutes, at the very least, a valid notice of circumstances" that "renders Smart's December 15, 2014 letter and Complaint Claims made during the D&O Policy period." (*Id.*) Benecard claims "Smart's April 22, 2014 letter . . . qualifies as a 'Claim' because it (1) states 'a dispute between Smart and Benecard is a likelihood,' and (2) requests Benecard 'preserv[e] the documents relevant to the parties' relationship' and 'take whatever other actions are necessary to preserve the status quo and protect the parties' respective rights and obligations.'" (*Id.* n.9 (quoting Smart's Apr. 22, 2014 Correspondence).)

Concerning the Allied World D&O Policy's exclusions, Benecard submits that, unless they unambiguously bar coverage, Allied World cannot escape its obligation to provide defense coverage. (*Id.* at 14.) Benecard asserts the Policy contains conflicting professional services exclusions and, thus, only the latest of which (i.e., the Insurance Company E&O Exclusion) is "potentially operative." (*Id.* at 16–17.) Citing the exclusion's title, Benecard argues the exclusion does not apply because Benecard is not an insurance company, it only provided plan management services to Smart, and none of Smart's allegations involve any insurance policy. (*Id.* at 17–18.) Benecard claims the exclusion only applies to another insured, Heartland Fidelity Insurance Company ("Heartland"). (*Id.* at 18.) Benecard adds that, if any exclusion applies as Allied World contends then coverage under the Allied World D&O Policy would be illusory. (*Id.*) It argues that Allied World fully understood Benecard's business and that it would violate Benecard's

reasonable expectations and, consequently, New Jersey public policy if the Court found no coverage for the Smart action. (*Id.* at 19–20.) If the Third-Party Services Exclusion applied, Benecard opines, then the Policy would only apply to certain securities violations, which would afford it no coverage because it is a family owned-company. (*Id.* at 20–21.)

### B. Allied World's Opposition and Moving Brief

Allied World argues that no claim was made during the policy period. (Cross Br. 13.) Allied World explains that the Policy provides coverage for claims "first made during the Policy Period . . . against the Company for any Wrongful Act." (*Id.* (quoting Allied World D&O Policy at AW93, Ex. B to Simpson Cert., ECF No. 174-6) (emphasis removed).) It highlights that "claim," in relevant part, is defined as "any written demand for monetary, non-monetary[,] or injunctive relief made against an Insured" or any "judicial, administrative[,] or regulatory proceeding, whether civil or criminal, for monetary, non-monetary[,] or injunctive relief commenced against an Insured." (*Id.* (quoting Allied World D&O Policy at AW95).) Allied World submits that, because Smart's April 22, 2014 correspondence made no demand for monetary or non-monetary relief, it does not qualify as a claim under the Policy. (*Id.* at 14.) Further, Allied World contends, it could not have been a claim because the Transition Agreement between Smart and Benecard provided neither party could take action against the other without participating in dispute resolution. (*Id.* at 14–15.) Allied World suggests that Benecard's April 30, 2015 correspondence was an attempt to create an expansion of coverage for which it did not bargain. (*Id.* at 14 (quoting *Zuckerman v. Nat'l Union Fire Ins. Co.*, 100 N.J. 304, 324 (1985)).)

Turning to the Notice of Circumstances provision, Allied World asserts Benecard's argument is without merit. (*Id.* at 15.) According to Allied World, the Policy states that notice of a claim will be deemed made at the time of a written notice of circumstances if it contains the following information: (1) the wrongful act at issue; (2) the anticipated allegations; (3) the reasons

14

for anticipating such a claim; and (4) the full particulars as to dates, persons, and entities involved. (*Id.* at 15 (quoting Allied World D&O Policy at AW87).) Allied World submits Benecard failed to comply with those requirements, including failing to detail which agreements may potentially be the subject of a claim, the potential wrongful acts, anticipated allegations, the reasons for such possible claims, or the dates and persons involved. (*Id.*) Allied World contends a showing of prejudice is not required under its claims-made policy, (*id.* at 16 (citing *Gazis v. Miller*, 186 N.J. 224, 229 (2006))), and, referring to the Atlantic Specialty D&O Policy, asserts Benecard cannot seek coverage from two successive claims-made policies, (*id.*).

Discussing the Policy's exclusions, Allied World submits coverage is barred under the Third-Party Services Exclusion because it forecloses coverage for any claim "based upon, arising out of . . . or in any way involving any actual or alleged act, error, omission, misstatement, misleading statement[,] or breach of duty in connection with the rendering of, or failure to render, services to a third party." (*Id.* at 17–18 (quoting Allied World D&O Policy at AW49).) Allied World notes that Smart's allegations are "replete with allegations of Benecard's failures in the performance of services as the administrator of the Part D Plan pursuant to a contract entered into with Smart, a 'third party.'" (*Id.* at 18.)

Allied World argues there is no conflict between the Third-Party Services Exclusion and the other exclusions dealing with professional services, because they all bar coverage in connection with specific services to avoid duplication of Allied World's E&O coverage. (*Id.* at 18–19.) Allied World contends Benecard fails to point to, and that there is no, conflicting language in the exclusion; thus the Court must give effect to the Policy as written. (*Id.* at 19–20.) Further, Allied World asserts application of the exclusions will not render coverage illusory, because "as the name implies, the D&O Policy would apply to claims alleging wrongful conduct or breaches of fiduciary

duties of Benecard's directors and officers." (*Id.* at 22.) Additionally, Allied World argues, the Insurance Company E&O Exclusion bars coverage for "any **Claim** arising out of, based upon, or attributable to the rendering of or failure to render professional services by any **Insured**," and "[s]uch professional services include, but are not limited to, the underwriting of insurance policies or reinsurance contracts," and is in no way limited to insurance companies or insurance contracts. (*Id.* at 23 (quoting Allied World D&O Policy at AW58).)

With respect to Benecard's bad faith claim, Allied World asserts the claim is frivolous because New Jersey applies the "fairly debatable" standard, so when an insurer denies coverage with a reasonable basis it cannot be guilty of bad faith. (*Id.* at 25–26.)

## C.    Benecard's Reply and Opposition

Benecard responds that it will not obtain double recovery because any recovery under the Allied World D&O Policy will pay defense costs covered by the Allied World E&O Policy, freeing the coverage limit allowed under the Allied World E&O Policy to be used for indemnification of the settlement. (Benecard's Opp'n Br. 3, ECF No. 187.) It further submits that, even if Allied World has no obligation to provide defense coverage, it may still be required to indemnify Benecard. (*Id.* at 4.)

Highlighting that the Allied World D&O Policy and the Allied World E&O Policy contain the same Notice of Circumstances provision, Benecard contends Allied World cannot meet its burden of proving Benecard did not comply with the provision. (*Id.* at 11.) Benecard points to Allied World's internal claims notes, which identify its April 22, 2014 correspondence as an "NOPC" ("notice of potential claim"). (*Id.* at 12 (Allied World's Claims Notes 2, Ex. C to Bartell Suppl. Cert., ECF No. 187-5).)

Further, Benecard submits that the Allied World D&O Policy provides that Allied World cannot reject late notice of a claim unless it "can establish that its interests were materially

16

prejudiced by reason of such late notice." (*Id.* at 13 (quoting Allied World D&O Policy at AW70).)
Additionally, Benecard emphasizes that, in its declination letter, Allied World invited it to send
any additional information Benecard believed would bear on coverage. (*Id.* (quoting Allied
World's May 9, 2014 Correspondence 2, Ex. E to Simpson Cert., ECF No. 174-9).) Benecard
claims it sent such information when it forwarded Smart's December 15, 2014 correspondence,
and that Allied World received additional information by providing it defense coverage under its
E&O Policy. (*Id.*)

Benecard contends that the Court can only conclude that the professional service-related
exclusions are ambiguous and must resolve that ambiguity by applying the least restrictive of the
exclusions: the Insurance Company E&O Exclusion. (*Id.* at 5–6 (citing *Simonetti v. Selective Ins.
Co.*, 372 N.J. Super. 421, 428 (App. Div. 2004) ("[W]here an ambiguity exists, it must be resolved
against the insurer." (citation omitted))).) Benecard argues that the "not limited to" language of
the Insurance Company E&O Exclusion must be read in context and the exclusion should only
apply to insurance-related activities. (*Id.* at 7–8.) Similarly, Benecard contends the Professional
Services Exclusion cannot apply because Allied World's files show the exclusion derives from
one dealing with medical services and must be read in context with the other provisions in
Endorsement No. 12. (*Id.* at 8 (citing Mar. 2011 E-mail Messages and Endorsement 14 Draft at
AW2352–57, Ex. A to Bartell Supp. Cert., ECF No. 187-3; Endorsement 14 Draft at AW2113–18,
Ex. B to Bartell Supp. Cert., ECF No. 187-4).) Lastly, Benecard claims that the Third-Party
Services Exclusion cannot apply because it would violate New Jersey's policy interpretation
principles by rendering the Insurance Company E&O Exclusion and the Professional Services
Exclusion superfluous because it would bar coverage for all services, generally. (*Id.* at 9.)

Moreover, Benecard adds, application would make coverage illusory, because any claim against an officer or director would necessarily arise out of Benecard's business of rendering services. (*Id.*)

Benecard argues whether Allied World acted in bad faith is a triable issue because its claim is not based on a wrongful denial of coverage, but on Allied World's objectively unreasonable investigation. (*Id.* at 18.) Benecard argues the "fairly debatable" standard, therefore, does not apply to its claim. (*Id.* (citing *Laing v. Am. Strategic Ins. Corp.*, No. 14-1103, 2014 WL 4953250, at *3 (D.N.J. Oct. 1, 2014)) (establishing a fairly debatable standard only for cases of bad faith denial of benefits).) Even if it did apply, Benecard contends, Benecard still has a triable bad faith claim because Allied World had no reason to deny coverage. (*Id.* at 21.)

### D.    Allied World's Reply

In its reply, Allied World submits that Benecard relies on nonbinding cases from other jurisdictions to attempt to create a triable issue as to its indemnity coverage. (Allied World's Reply 2, ECF No. 197.) Allied World stresses that under New Jersey law, the duty to defend is broader than the duty to indemnify. (*Id.* at 2–3.)

Allied World contends that Benecard's reliance on the late notice provision and late notice cases are misplaced because the issue is whether Benecard reported a claim during the policy period. (*Id.* at 3.) Stated differently, Allied World claims Benecard is trying to conflate whether a notice of circumstances was made within the policy period and whether a claim was made within the policy period. (*Id.* at 6.) Allied World does not dispute the former, only the latter. (*Id.*) Allied World argues proving a claim was made within the policy period is Benecard's burden. (*Id.* at 3 (citing *Adron, Inc. v. Home Ins. Co.*, 292 N.J. Super. 463, 473 (App. Div. 1996)).) Turning to Benecard's notice arguments, it reiterates that Benecard did not satisfy the provision's requirement and that Allied World's internal notes show it was not sufficient. (*Id.* at 4 (citing Allied World's Claims Notes 2, ECF No. 187-5).) Allied World argues that Benecard cannot rely on how Allied

18

World handled Benecard's letter under the Allied World E&O Policy because the claims were handled separately, per policy requirements. (*Id.* at 5.) Additionally, Allied World argues they received the letter at the inception of the Allied World E&O Policy, and Smart's claim was made within the E&O Policy's policy period, whereas the letter under the D&O Policy was submitted on the final day of the policy. (*Id.*)

Allied World submits that the Third-Party Services Exclusion plainly applies to all claims arising out of services provided to third parties, and that the Insurance Company E&O and Professional Services Exclusions both apply to all claims arising from the rendering of professional services. (*Id.* at 7–8.) Allied World argues that, although the prior policies Benecard cites are related to medical services, the Allied World Policy contains no such limitation. (*Id.* at 8–9.) Allied World adds that the exclusions must be applied by their terms and that Benecard has failed to identify how they conflict. (*Id.* at 9.) Further, Allied World submits application of the exclusions does not render the Policy illusory because Benecard could face liability for alleged wrongful conduct of its officers or directors, or claims arising out of its commercial transactions. (*Id.*)

Lastly, Allied World contends the "fairly debatable" standard applies to bad faith claims based on claim handling practices. (*Id.* at 11 (discussing *Universal-Rundle Corp. v. Commercial Union Ins. Co.*, 725 A.2d 76 (N.J. Super. Ct. App. Div. 1999)).)

## IV.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" dispute "if the evidence is such

that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

"In evaluating the evidence, the Court must consider all facts and their logical inferences in the light most favorable to the non-moving party." *Rhodes v. Marix Servicing, LLC*, 302 F. Supp. 3d 656, 661 (D.N.J. 2018) (citing *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002)). "While the moving party bears the initial burden of proving an absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party to 'set forth specific facts showing that there is a genuine [dispute] for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 250). "Unsupported allegations, subjective beliefs, or argument alone . . . cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019). "Thus, if the nonmoving party fails 'to make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be no genuine issue of material fact . . . .'" *Id.* (quoting *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quotation marks omitted)). "In considering the motion, the Court 'does not resolve factual disputes or make credibility determinations.'" *Rhodes*, 302 F. Supp. 3d at 661 (quoting *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995)). "When ruling on cross-motions for summary judgment, the court must consider the motions independently, and view the evidence on each motion in the light most favorable to the party opposing the motion." *Einhorn v. Kaleck Bros.*, 713 F. Supp. 2d 417, 421 (D.N.J. 2010).

## V.   DISCUSSION

Interpreting an insurance contract is a legal question to be resolved by the Court. *Rena, Inc. v. Brien*, 708 A.2d 747, 756 (N.J. Super. Ct. App. Div. 1998). "In attempting to discern the meaning of a provision in an insurance contract, the plain language is ordinarily the most direct route." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008). "If the

20

language is clear, that is the end of the inquiry." *Id.* "If the plain language of the policy is unambiguous," the Court should "not engage in a strained construction to support the imposition of liability or write a better policy for the insured than the one purchased." *Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 129 A.3d 1069, 1075 (2016) (quoting *Chubb Custom Ins. Co.*, 948 A.2d at 1289) (internal citations omitted)). However, "it is a well-established principle that insurance contracts will not be enforced if they violate public policy." *Sparks v. St. Paul Ins. Co.*, 495 A.2d 406, 411 (N.J. 1985) (citations omitted).

"[W]hen disputes arise between the insured and insurer, the duty of an insurer to defend is generally determined by a side-by-side comparison of the policy and the complaint, and is triggered when the comparison demonstrates that if the complaint's allegations were sustained, an insurer would be required to pay the judgment." *Wear v. Selective Ins. Co.*, 190 A.3d 519, 527 (N.J. Super. Ct. App. Div. 2018). "[E]xclusions in insurance policies are presumptively valid and enforceable 'if they are specific, plain, clear, prominent, and not contrary to public policy.'" *Id.* at 528 (quoting *Flomerfelt v. Cardiello*, 997 A.2d 991, 996 (N.J. 2010) (further quotation omitted)). A provision in an insurance policy that "is subject to more than one reasonable interpretation . . . is ambiguous." *Templo Fuente*, 129 A.3d at 1075. The New Jersey Supreme Court has advised "that '[w]here the policy language [of an insurance policy] supports two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied." *Progressive Cas. Ins. Co. v. Hurley*, 765 A.2d 195, 202 (N.J. 2001) (quoting *Lundy v. Aetna Cas. & Sur. Co.*, 458 A.2d 106, 111 (N.J. 1983)). This approach, however, is limited to instances where "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Id.* (citations omitted). "When construing an ambiguous clause in an insurance policy, courts should consider whether clearer

draftsmanship by the insurer 'would have put the matter beyond reasonable question.'" *Id.* (quoting *Doto v. Russo*, 659 A.2d 1371, 1377 (N.J. 1995)). "Far-fetched interpretations of a policy exclusion are insufficient to create an ambiguity requiring coverage." *Wear*, 190 A.3d at 528. "Neither the duty to defend nor the duty to indemnify 'exists except with respect to occurrences for which the policy provides coverage.'" *Id.* at 528–29 (quoting *Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co.*, 98 N.J. 18, 22 (1984)).

New Jersey precedent allows "the reasonable expectations of the insured to override the plain meaning of a policy in exceptional circumstances." *Colliers Lanard & Axilbund v. Lloyds of London*, 458 F.3d 231, 236–37 (3d Cir. 2006); *Doto*, 659 A.2d at 1377. "These exceptional circumstances are narrowly confined," and "[t]he 'reasonable expectations' doctrine applies to policy forms that have the characteristics of an adhesion contract." *Abboud v. Nat'l Union Fire Ins. Co.*, 163 A.3d 353, 358 (N.J. Super. Ct. App. Div. 2017) "Courts are more inclined to apply the doctrine in cases of personal lines of insurance obtained by an unsophisticated consumer." *Id.* "Courts may vindicate the insured's reasonable expectations over the policy's literal meaning 'if the text appears overly technical or contains hidden pitfalls, cannot be understood without employing subtle or legalistic distinctions, is obscured by fine print, or requires strenuous study to comprehend.'" *Id.* at 359 (quoting *Zacarias v. Allstate Ins. Co.*, 168 N.J. 590, 601 (2001) (citations omitted) (rejecting "reasonable expectations" argument because the policy language was "not so confusing that the average policyholder cannot make out the boundaries of the coverage," nor was an "entangled and professional interpretation of an insurance underwriter . . . pitted against that of an average purchaser of insurance" (internal quotation marks and citation omitted))).

"In assessing whether the expectations are objectively reasonable, a court will consider communications regarding the coverage between the insured or its broker and the insurer or its

agent that relate to the insured's expectations." *Id.* "A court must also consider whether the scope of coverage is so narrow that it 'would largely nullify the insurance' and defeat the purpose for which it was obtained." *Id.* (citation omitted).

### A.    Benecard's Motion for Partial Summary Judgment

The Court begins with the plain language of the Allied World D&O Policy. The Policy states, "[t]he **Insurer** shall pay . . . the **Loss** arising from a **Claim,** first made during the **Policy Period** . . . for any **Wrongful Act,** and reported to the **Insurer**." (Allied World D&O Policy at AW93.) The parties' dispute centers around whether Smart's April 22, 2014 correspondence constitutes a "Claim," and, if not, whether Smart's claim relates back through the Notice of Claim section. The Court addresses each in turn.

In the Policy, "claim" means "any written demand for monetary, non-monetary[,] or injunctive relief made against an **Insured**." (*Id.* at AW95.) Smart's Complaint would undoubtedly meet that definition but for the fact that it was filed on June 8, 2015—more than a year after the expiration of the Policy Period. Benecard's April 30, 2014 correspondence, attaching Smart's April 22, 2014 correspondence, was sent on the last day of the Policy Period. Benecard's message reads "Attached [i]s notice of a potential claim under the above D&O policy," and provides no details of the circumstances. (Benecard's Apr. 30, 2014 D&O Correspondence 1.) Smart's correspondence similarly speaks only in general terms, stating "[a]s the October 10, 2013 Agreement between Benecard and Smart Insurance Company winds down, Smart has commenced the process of analyzing its rights and obligations under the parties' various agreements," and "[g]iven the events that have transpired over the last two years, we believe a dispute between Smart and Benecard is a likelihood." (*Id.* at 3.) The Court agrees with Allied World that a "written demand for . . . relief" is essential to the definition of "claim" in the Allied World D&O Policy, and thus Smart's April 22, 2014 correspondence cannot serve as a "claim" under the Policy.

Alternatively, Benecard seeks to have Smart's Complaint relate back to the Policy Period through its April 30, 2014 correspondence, which Benecard submits serves as a notice of claim. In relevant part, the Notice of Claim section states:

> If during the **Policy Period** an **Insured** shall become aware of *any circumstances which may reasonably be expected to give rise to a Claim* being made against an **Insured** and shall, during the **Policy Period,** give written notice to the **Insurer** . . . of the circumstances, including the **Wrongful Act,** allegations anticipated, and the reasons for anticipating such a **Claim,** with full particulars as to dates, persons and entities involved, any **Claim** that is subsequently made against the **Insured** alleging, arising out of, based upon or attributable to such circumstances, shall be deemed to have been made at the time written notice of such circumstances was first given to the **Insurer.**

(Allied World D&O Policy at AW87 (italics added) (bolding in original).)

Resolving ambiguities in favor of the insured, the Court agrees with Benecard that Smart's correspondence was sufficient to comprise notice of Smart's breach of contract claim. Though barebones, the correspondence identifies the wrongful act, breach of contract, the reason for anticipating such a claim, Smart's April 22 correspondence, and the dates and entities involved. (Benecard's Apr. 30, 2014 D&O Correspondence 3.) Moreover, Allied World does not deny it accepted identical correspondence as a notice of claim under the E&O Policy. (Allied World's Jun. 9, 2014 Correspondence 2, ECF No. 170-14. *Compare* Benecard's Apr. 30, 2014 E&O Correspondence 1, 3, *with* Benecard's Apr. 30, 2014 D&O Correspondence 1, 3.) Allied World's assertion that the Court cannot consider how the correspondence was treated because it was decided under a different Policy does nothing to resolve the ambiguity as to how detailed notice of a potential claim must be. The only apparent difference in the situations is that the notice was given on the expiration date of the Allied World D&O Policy. The date of notice, however, does not affect the plain meaning of the Policy.

Further, the Court rejects Allied World's interpretation of the Policy that the claim must arise during the Policy Period even where proper notice is given within the Policy Period but the claim arises after its expiration. The Court cannot reconcile Allied World's reading with the relation back clause that plainly states, "any **Claim** that is subsequently made . . . based upon or attributable to such circumstances . . . shall be deemed to have been made at the time written notice of such circumstances was first given to the **Insurer**." (Allied World D&O Policy at AW87.) To read the Policy in the manner Allied World contends would negate that clause. The Court thus must turn to the Policy's exclusions.

The Court notes that exclusions are to be narrowly construed but must be applied if they are "specific, plain, clear, prominent, and not contrary to public policy." *Flomerfelt*, 997 A.2d at 996 (internal quotation marks and citation omitted). The Third-Party Services Exclusion plainly bars coverage for any claim "arising out of, . . . or in any way involving any actual or alleged act, error, omission, misstatement, misleading statement[,] or breach of duty in connection with the rendering of, or failure to render, services to a third party." (Allied World D&O Policy at AW49.) Smart's action arises out of Benecard's agreement to provide services for Smart's Part D plans, and Smart alleged the misrepresentations were made in an effort to prevent Smart from terminating that agreement. The exclusion is unambiguous and the Court agrees that there can be no potential coverage under the Policy for the Smart action.

The question then is whether the inclusion of narrower exclusions either conflict or cause the Policy to be ambiguous. The Court finds no conflict between the exclusions' terms and notes that Benecard did not identify any. Rather, Benecard's argument is that, because the exclusions overlap, the only way to read the Policy without rendering the exclusions superfluous is to drop the Third-Party Services and Professional Services Exclusions and apply only a narrow reading of

the Insurance Company E&O Exclusion. Although the Court finds some merit in Benecard's argument that the Insurance Company E&O Exclusion—despite its use of the term "but . . . not limited to"—applies only to insurance-related services, the Court cannot ignore the other two exclusions entirely.

The Insurance Company E&O Exclusion bars coverage for "any **Claim** arising out of, based upon, or attributable to the rendering of or failure to render professional services by any **Insured**," including, "but [] not limited to, the underwriting of insurance policies or reinsurance contracts; the handling and adjusting of claims arising under an insurance policy or reinsurance contract; [and] risk management services." (Allied World D&O Policy at AW58.) Read in context, it would appear that this exclusion is targeted at insurance-related professional services. *See Sealed Air Corp. v. Royal Indem. Co.*, 961 A.2d 1195, 1206 (N.J. Super. Ct. App. Div. 2008) (applying the maxim of *noscitur a sociis* to the phrase "in any way involving").

The Professional Services Exclusion, on the other hand, is written more broadly, barring coverage for any claim "alleging, arising out of, based upon[,] or attributable to[,] or in any way relating to the rendering or failure to render any professional services." (Allied World D&O Policy at AW62). The Court finds that the exclusions, although overlapping, are targeted at different risks. One is aimed at insurance-related services, another at professional services broadly, and the third at any rendering of services to a third party. This does not create a conflict in the Policy. It may be possible that complementary exclusions, like those in the Allied World D&O Policy, could give rise to an ambiguity; but the Court does not find, and Benecard does not offer, any ambiguity. The Policy unambiguously precludes coverage for claims arising out of the failure to provide professional services as well as services to a third party in general. Consequently, by the Policy's terms, Allied World is not liable to Benecard for defense coverage.

Lastly, Benecard asserts that, if applied, the exclusions would render the Allied World Policy's coverage illusory and, as a result, the Court should read the Policy in accord with Benecard's reasonable expectations. There are two problems with overriding the Policy exclusions in this case. First, Benecard has identified nothing demonstrating it anticipated coverage under the Allied World D&O Policy for an action like the Smart action. In fact, a significant portion of Benecard's argument is that the Policy is ambiguous because it included what Benecard alleged to be the same exclusion three times. Further, while Benecard is not a public company, the Court notes "[p]ublic companies generally purchase D&O insurance for two reasons: (1) to protect the company's balance sheet against securities fraud claims and the company's obligation to indemnify its directors and officers; and (2) to assist in the retention of directors and officers by protecting them when the company is unable to indemnify them." Timothy W. Burns et al., Mortgage and Asset Backed Securities Litigation Handbook § 8:119 (Nov. 2019). "E&O . . . policies primarily protect the company against claims relating to acts and omissions in the performance of professional services." *Id.* § 8:126. Aside from what Benecard presently wants covered, the Court is unsure what Benecard's reasonable expectations were when it purchased the Allied World D&O Policy. Moreover, Allied World offers circumstances in which Benecard would be covered under the Policy, and a lack of coverage under a D&O policy for claims arising out of an agreement to provide services appears consistent with the general purpose and distinction between D&O and E&O coverage.

Second, the exclusions can hardly be characterized as "pitfalls." They are plainly worded and prominent in the Policy. The court cannot agree that they are so technical that Benecard could reasonably misread them. Accordingly, the Court will honor the Policy's plain language and enforce it as written.

**B.    Allied World's Motion for Summary Judgment**

Having determined that the Third-Party Services Exclusion and the Professional Services Exclusion unambiguously apply to Smart's claim and that there is no potential coverage under the Allied World D&O Policy, the Court concludes that there is no obligation for Allied World to pay Benecard's defense or indemnity expenses under the Policy. Accordingly, the Court will grant Allied World's Cross-Motion for Summary Judgment and dismiss Counts I and VI of Benecard's Amended Complaint with prejudice.

The Court now turns to Benecard's claim that Allied World acted in bad faith by, among other things, (1) "refusing to accept Benecard's April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of claim," (2) "refusing to accept Benecard's April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of circumstances," and (3) "refusing to accept Benecard's April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of circumstances under Allied[ World]'s D&O Policy while simultaneously treating Benecard's identical April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of circumstances under Allied[ World]'s E&O Policy." (Am. Compl. ¶ 103.)

"[O]nce an insurer has had a reasonable opportunity to investigate, or has learned of grounds for questioning coverage, it then is under a duty promptly to inform its insured of its intention to disclaim coverage or of the possibility that coverage will be denied or questioned." *Griggs v. Bertram*, 443 A.2d 163, 168 (N.J. 1982). "[A]n insurer's unreasonable delay in asserting its right to deny a claim can estop the insurer from disclaiming coverage, even for a claim that would fall outside the policy." *Fed. Ins. Co. v. Cherokee Ardell, L.L.C.*, No. 08-2581, 2011 WL 1254036, at *18 (D.N.J. Mar. 28, 2011). Benecard does not seek to estop Allied World from denying coverage, but instead seeks damages for its delay and alleged failure to conduct an investigation.

"Under the 'fairly debatable' standard, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim." *Pickett v. Lloyd's*, 621 A.2d 445, 454 (N.J. 1993). "A more difficult application of the standard arises when the issue involves not a denial or refusal to pay a claim but, as here, inattention to payment of a *valid, uncontested claim*." *Id.* (emphasis added). "In the case of processing delay, bad faith is established by showing that no valid reasons existed to delay processing the claim and the insurance company knew or recklessly disregarded the fact that no valid reasons supported the delay." *Id.* at 457–58. "In either case (denial or delay), liability may be imposed for consequential economic losses that are fairly within the contemplation of the insurance company." *Id.* at 458. Whether arising under a denial of coverage or a delay in processing a claim, "the test appears to be essentially the same." *Id.* at 454.

A bad faith claim for a delay in processing opens the insurer to liability for consequential damages arising from the delay in payment of the *valid* claim. *Id.* Because the Allied World D&O Policy does not provide coverage for the Smart action, Benecard cannot recover consequential damages for Allied World's alleged bad faith delay. *See also Universal-Rundle Corp.*, 725 A.2d at 88–90.

Further, the Court finds that Benecard's bad faith claim more accurately fits the mold of a bad faith denial of coverage claim because there is no allegation of unreasonable delay. Accordingly, the fairly debatable standard applies. Finding no coverage is afforded by the Allied World D&O Policy for the Smart action, the Court holds there can be no liability on Benecard's bad faith claim. Consequently, the Court grants Allied World's Cross-Motion for Summary Judgment on Count X.

### C.    RSUI's Excess Policy

A "follow form" excess policy is a policy in which the coverage issues in the excess policy turn solely on the interpretation of the underlying primary policy. *See Houbigant, Inc. v. Fed. Ins. Co.*, 374 F.3d 192, 203 (3d Cir. 2004). Because the Court holds the Allied World D&O Policy does not provide coverage for the Smart action, Benecard cannot recover under its Excess Liability Policy. The Court will thus grant RSUI's Motion, in part.

### VI.    CONCLUSION

For the reasons stated above, Benecard's Motion for Partial Summary Judgement is denied, and Allied World's Cross-Motion for Summary Judgment is granted. Counts I, V, and X as to Allied World are dismissed with prejudice. RSUI's Motion is granted in part, and Count III—to the extent Benecard seeks coverage under Excess Liability Policy Number HS651201—is dismissed with prejudice. An order consistent with this Memorandum Opinion will be entered.


MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE