**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

BENECARD SERVICES, INC.,

          Plaintiff,

          v.

ALLIED WORLD SPECIALTY
INSURANCE COMPANY f/k/a DARWIN
NATIONAL ASSURANCE COMPANY,
et al.,

          Defendants.

Civil Action No. 15-8593 (MAS) (TJB)

**MEMORANDUM OPINION**

**SHIPP, District Judge**

      This matter comes before the Court upon Plaintiff Benecard Services Inc.'s ("Benecard") Motion for Partial Summary Judgment Against Travelers Property Company of America ("Travelers") (the "Motion"), (ECF No. 171), and Travelers's Opposition to Benecard's Motion and Cross-Motion for Summary Judgment (the "Cross-Motion"), (ECF No. 180). ACE Property & Casualty Company ("ACE") joined in the Cross-Motion (the "ACE Motion") "[b]ecause each of the ACE excess policies at issue in this action follows form to the underlying Travelers'[s] policy and does not pay a loss if the underlying Travelers policy does not pay the loss." (Notice of Joinder 2, ECF No. 173). Benecard opposed Travelers's Cross-Motion, (ECF No. 188), and Travelers filed a reply, (ECF No. 193), in which ACE joined sections I, II, and IV, (ACE's Joinder in Reply 1, ECF No. 195). ACE also joined section V of Atlantic Specialty Insurance Company's ("Atlantic Specialty") Reply Brief in Support of Atlantic Specialty's Motion for Summary

Judgment (ECF No. 198). (ACE's Joinder in Reply 1). The Court has carefully considered the parties' arguments and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Benecard's Motion for Partial Summary Judgment is denied, and Travelers's Cross-Motion for Summary Judgment is granted. All claims as to Travelers (i.e., Counts IV and VII) are dismissed with prejudice, and the Court enters summary judgment on Travelers's Counterclaim declaring that Travelers does not have any obligation to defend, indemnify, or reimburse any sums to Benecard in connection with the Smart action. The Court further grants ACE's Motion and hereby enters summary judgment in its favor and dismisses Counts V and XI of Benecard's Amended Complaint with prejudice.

## I.   BACKGROUND

### A.   Undisputed Facts

#### 1. The Smart Action

In 2011, Smart Insurance Company ("Smart"), "decided to create and operate Medicare Part D prescription drug plans." (Benecard's Statement of Material Facts Against Travelers ("BMF") ¶ 2, ECF No. 171-4; Travelers's Response to BMF ("TRMF") ¶ 2, ECF No. 180-3.) In 2012, Smart was approved by the Centers for Medicare and Medicaid Services ("CMS") to act as a Medicare Part D plan sponsor. (Smart Compl. ¶ 24, Ex. B to Certification of Nicole Corona ("Corona Cert."), ECF No. 171-5.) Benecard agreed to provide Smart with certain services in connection with the Part D plans. (*Id.* ¶¶ 16–19.) As alleged by Smart, Benecard was tasked with (1) handling all matters related to member enrollment; (2) managing the plan formulary and adjudicating member claims for coverage at the point of sale; (3) administering the coverage determination, appeal, and grievance process; (4) providing Smart with real-time, online access to Benecard's prescription drug claims database and system; (5) running the call center and

answering member questions; and (6) complying with federal law and CMS requirements. (*Id.*
¶ 19.)

On April 23, 2013, after auditing the plans, CMS sanctioned Smart, suspending enrollment
in and marketing of the plans. (*Id.* ¶ 50.) Smart wrote to Benecard on April 22, 2014, to advise that
"a dispute between Smart and Benecard is a likelihood." (BMF ¶ 15; TRMF ¶ 15.) Smart sold the
plans that August and, on December 15, 2014, advised Benecard that it "intend[ed] to pursue
claims against [it] for, among other things, breach of contract and fraud." (BMF ¶¶ 14, 16 (quoting,
in part, Smart's Dec. 15, 2014 Correspondence, Ex. N to Corona Cert., ECF No. 171-5; TRMF
¶¶ 14, 16; Smart's Dec. 15, 2014 Correspondence 1.)

On June 8, 2015, Smart filed suit against Benecard in the United States District Court for
the Southern District of New York, (BMF ¶ 17; TRMF ¶ 17), alleging claims "aris[ing] out of the
failure of Benecard to perform its contractual obligation to manage Smart's Medicare Part D
Prescription Drug plans," and "out of a number of intentionally false representations and material
omissions that Benecard made to convince Smart not to terminate their contract," (Smart Compl.
¶ 1). Smart asserted two counts: (1) breach of contract, and (2) fraudulent misrepresentation,
omission, or concealment. (*Id.* ¶¶ 92, 101–05.)

Beginning with the contractual failures, (*id.* ¶¶ 27, 54–55), Smart alleged that,

> [a]fter the Plans were launched on January 1, 2013, Smart's
> monitoring efforts uncovered a number of problems with
> Benecard's performance, including but not limited to: (a) its failure
> to properly handle and process a number of beneficiary enrollment
> requests, (b) its failure to provide required information to
> beneficiaries in a timely manner, (c) its failure to provide a toll-free
> claims service to answer general program questions and specific
> inquiries from beneficiaries, providers and pharmacies, (d) its

> failure to provide proper notice to Smart of certain compliance
> issues and (e) its improper rejection of claims at the point-of-sale.

(*Id.* ¶ 33.) Smart claimed that its efforts at supervision of Benecard's efforts to redress those problems "were thwarted by Benecard's . . . efforts to conceal the true nature and extent of its problems from Smart." (*Id.* ¶ 35.) According to Smart, Benecard knew even before the launch date that "it was not going to be ready to process claims or handle coverage determination requests, appeals, and grievances" and that significant problems were going to occur on launch. (*Id.* ¶ 38.) Nevertheless, Smart alleges, Benecard "concealed the information," and "Benecard's senior management, including Chief Executive Officer Michael Perry ("Perry"), instructed Benecard's staff to make sure Smart falsely believed Benecard would be ready to launch the Plans by January 1[, 2013]." (*Id.*) Smart claimed Benecard ignored its corrective efforts, refused assistance, and spurned Smart's repeated requests for real-time access to its systems until the eve of CMS's audit. (*Id.* ¶¶ 39–42.) Furthermore, after CMS's audit identified several problems with Benecard's system, including the improper denial of prescription drug coverage at the point of sale, Smart alleged "Benecard represented to Smart that it had fixed the identified problems." (*Id.* ¶¶ 39–42, 47.) According to Smart, CMS's sampling of claims showed Benecard had not fixed many of the issues, and also identified ten new deficiencies. (*Id.* ¶ 47.) CMS imposed sanctions, including prohibiting new member enrollment and marketing, which Smart alleged cost it "tens of thousands of new members and millions of dollars." (*Id.* ¶ 50.)

Turning to Benecard's alleged "misrepresentations, omissions and concealment," Smart alleged Benecard "made a number of false representations and material omissions" and "concealed critical information from Smart, knowingly and intentionally and with the goal of ensuring that Smart did not terminate the Agreement." (*Id.* ¶¶ 56–57.) As an example, Smart alleged "Benecard representatives, including Michael Perry, represented to Smart throughout the last quarter of 2012

4

that Benecard would be ready to handle its claim processing responsibilities and coverage determination, appeal and grievance processing responsibilities on January 1, 2013," but that "Benecard knew these representations were false," and "Perry instructed his staff to conceal from Smart that Benecard would not be ready and that it was falling further and further behind schedule." (*Id.* ¶ 58.) Smart further alleged, among many other examples, that Benecard's senior personnel instructed its employees to ignore Smart's corrective action plans, that Benecard assigned untrained personnel to its call center after telling Smart that Benecard would rapidly increase the number of properly trained staff, and that Benecard's Chief Operating Officer told employees that its system was proprietary and that Smart would not be given access to it after repeatedly representing to Smart that it would be given real-time online access. (*Id.* ¶¶ 59–61.) Smart alleged "Benecard made all of the misrepresentations and material omissions described above to Smart in the last few months of 2012 and the first two months of 2013 . . . ." (*Id.* ¶ 96.) Smart asserted that "[w]hen Benecard made these misrepresentations and omissions to Smart, it knew they were false, or, alternatively, it made them recklessly and without knowledge as to their truth or falsity," that Benecard "knew it was concealing information that was material to Smart in determining whether to terminate the Agreement," and "made these statements and omissions with the intention of Smart relying on them, with the intent to deceive Smart or with reckless disregard." (*Id.* ¶¶ 97–99.) Smart claimed that, "[i]f Benecard had not made these misrepresentations and omissions, and if Smart had been aware of the true nature and depth of the problems at Benecard, Smart would have terminated the Agreement, switched to a new [pharmacy benefit manager] much earlier and saved its Plans from further damage." (*Id.* ¶ 69.) Smart asserted it had been damaged as a result of Benecard's misrepresentations, omissions, and concealment. (*Id.* ¶ 104.)

In June 2013, CMS informed Smart that the Plans were still not adjudicating claims properly and that CMS would "terminate the Plans on August 1, 2013 unless Smart sold the Plans by July 31, 2013." (*Id.* ¶ 73.) Smart alleged it sold the Plans to another company on August 31, 2013 for a fraction of their prior market value. (*Id.* ¶ 74.) Smart sought damages comprising the amounts it paid Benecard for its services under the contract, the amounts Smart paid to others to assist Benecard, and the Plans' diminished value. (*Id.* ¶ 90.)

Smart and Benecard entered into mediation. (Travelers's Statement of Material Facts ("TMF") ¶ 20, ECF No. 180-2; Benecard's Response to TMF ("BRMF") ¶ 20, ECF No. 184 (citing Smart's Mediation Statement, Ex. A to Corona Cert. ECF No. 171-5).) Smart and Benecard ultimately settled. (TMF ¶ 21; BRMF ¶ 21.)

### 2. Benecard's Insurance Policies

Travelers sold Benecard three general liability insurance policies (collectively, the "Travelers Policies" or the "Policies"). (BMF ¶ 23 (citing Travelers 2012 Policy, Ex. P to Corona Cert., ECF No. 171-6; Travelers 2011 Policy, Ex. O to Corona Cert., ECF No. 171-6; Travelers 2013 Policy, Ex. Q to Corona Cert., ECF No. 171-7); TRMF ¶ 23.) The parties do not dispute that the Policies are substantially similar in all material respects for purposes of the legal issues presented by Benecard's Motion. (BMF ¶ 25; TRMF ¶ 25.)

Under the Policies, Travelers agreed "[to] pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies." (Travelers 2013 Policy, at TRAV-1265; *see also* BMF ¶ 30; TRMF ¶ 30; TMF ¶ 25; BRMF ¶ 25.) The 2011 Policy states:

> b. This insurance applies to:
>
> (1) "Personal injury" caused by an offense arising out of your business, excluding advertising, publishing, broadcasting or

6

> telecasting done by or for you; . . . but only if the offense was
> committed in the "coverage territory" during the policy period.

(Travelers 2011 Policy, at TRAV-1073.) The 2012 and 2013 Policies state the insurance applies

to "'personal and advertising injury' caused by an offense arising out of your business." (Travelers

2012 Policy, at TRAV-1163; Travelers 2013 Policy, at TRAV-1265.) The 2011 Policy defines

"Personal Injury" as

> injury, other than "bodily injury", arising out of . . .
>
> . . .
>
> d. Oral, written or electronic publication of material that slanders or
> libels a person or organization or disparages a person's or
> organization's goods, products or services, provided that claim is
> made or "suit" is brought by a person or organization that claims to
> have been slandered or libeled, or whose goods, products or services
> have allegedly been disparaged; or
>
> e. Oral, written or electronic publication of material that
> appropriates a person's likeness, unreasonably places a person in a
> false light or gives unreasonable publicity to a person's private life.

(Travelers 2011 Policy, at TRAV-1076; *see also* BMF ¶ 26; TRMF ¶ 26.) The 2012 and 2013

Policies define "personal injury" as:

> (4) Oral or written publication, including publication by electronic
> means, of material that slanders or libels a person or organization or
> disparages a person's or organization's goods, products or services,
> provided that the claim is made or the "suit" is brought by a person
> or organization that claims to have been slandered or libeled, or that
> claims to have had its goods, products or services disparaged; or
>
> (5) Oral or written publication, including publication by electronic
> means, of material that:
>
>> (a) Appropriates a person's name, voice, photograph or
>> likeness;
>>
>> (b) Unreasonably places a person in a false light; or
>>
>> (c) Discloses information about a person's private life.

7

(Travelers 2012 Policy, at TRAV-1179; Travelers 2013 Policy, at TRAV-1281.) Travelers's
payment of defense costs does not reduce the limits of liability under the Policies. (BMF ¶¶ 31,
42; TRMF ¶¶ 31, 42.)

Travelers also sold Benecard three excess liability policies ("umbrella policies"). (TMF
¶¶ 30–32 (citing 2011 Umbrella Policy, Ex. 1 to Corbett Cert., ECF No. 180-5; 2012 Umbrella
Policy, Ex. 2 to Corbett Cert., ECF No. 180-6; 2013 Umbrella Policy, Ex. 3 to Corbett Cert., ECF
No. 180-7)); BRMF ¶¶ 30–32.) The 2011 Umbrella Policy provides:

> 1. [Travelers] will pay on behalf of the insured those sums, in excess
> of the amount payable under the terms of any Personal, Advertising,
> and Web Site Injury Liability Insurance included in the "underlying
> insurance", that the insured becomes legally obligated to pay as
> damages because of:
>
> a. "Personal injury" and "advertising injury"; and,
>
> . . .
>
> 3. This insurance is subject to the same insuring agreements, terms,
> definitions, exclusions and conditions as any Personal, Advertising
> and Web Site Injury Liability Insurance included in the "underlying
> insurance", except for the provisions of this endorsement.

(2011 Umbrella Policy, at TRAV-1371.) The 2012 and 2013 Policies provide excess coverage for
"the 'ultimate net loss' in excess of the 'applicable underlying limit' which the insured becomes
legally obligated to pay as damages because of 'bodily injury', 'property damage', 'personal
injury' or 'advertising injury' to which this insurance applies." (2012 Umbrella Policy, at
TRAV-1404; 2013 Umbrella Policy, at TRAV-1455).) Both Policies contain, in relevant part, the
identical definition of "personal injury" as Travelers 2011 Primary Policy. (*Compare* 2012
Umbrella Policy, at TRAV-1414, *and* 2013 Umbrella Policy, at TRAV-1465, *with* Travelers 2011
Policy, at TRAV-1076.)

8

In addition to the Travelers Policies, ACE sold Benecard three successive one-year excess liability catastrophe policies, collectively effective from April 12, 2011 to April 12, 2014. (ACE Statement of Material Facts ("AMF") ¶ 1, ECF No. 173-3; 2011 ACE Policy, at ACE140, Ex. A to Certification of Marianne May ("May Cert."), ECF No. 173-2; 2012 ACE Policy, at ACE164, Ex. B to May Cert., ECF No. 173-2; 2013 ACE Policy, at ACE96, Ex. C to May Cert., ECF No. 173-2.) Each ACE policy provides excess coverage over each umbrella policy issued by Travelers. (AMF ¶ 2; 2011 ACE Policy, at ACE140–41; 2012 ACE Policy, at ACE164–65; 2013 ACE Policy, at ACE96–97.) The 2011 ACE Policy provides:

> A. COVERAGE
>
> WE will pay on YOUR behalf the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE, and (2) only after all UNDERLYING INSURANCE has been exhausted by the payment of the limits of such insurance for losses arising out of OCCURRENCES that take place during OUR policy period and are insured by all of the policies designated in the Declarations as UNDERLYING INSURANCE. If any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance then WE shall not pay such loss.
>
> The Definitions, Terms, Conditions, Limitations, and Exclusions of the "first policy of UNDERLYING INSURANCE", in effect at the inception date of this policy, apply to this coverage unless they are inconsistent with the provisions of this policy, or relate to premium, subrogation, any obligation to defend, the payment of expenses, limits of insurance, cancellation or any renewal agreement.

(AMF ¶ 5; 2011 ACE Policy, at ACE145.) The 2012 and 2013 ACE Policies contain substantially the same terms. (AMF ¶¶ 6–7; 2012 ACE Policy, at ACE175; 2013 ACE Policy, at ACE119.) The underlying insurance for the 2011, 2012, and 2013 ACE Policies are the 2011, 2012, and 2013 Travelers Policies, respectively. (2011 ACE Policy, at ACE141; 2012 ACE Policy, at ACE164; 2013 ACE Policy, at ACE96.)

On April 30, 2014, Benecard notified Travelers of Smart's April 22, 2014 correspondence that advised Benecard a dispute between them was likely. (BMF ¶ 43; TRMF ¶ 43.) Before Smart filed suit, on December 19, 2014, Benecard sent correspondence to Travelers advising it of Smart's December 15, 2014 correspondence and Smart's intent to pursue claims against Benecard. (BMF ¶ 45; TRMF ¶ 45; Benecard's Dec. 19, 2014 Correspondence to Travelers, Ex. U to Corona Cert., ECF No. 171-7.) On December 24, 2014, Travelers denied it was "obligated to defend or indemnify" Benecard in an action by Smart. (BMF ¶ 46; TRMF ¶ 46; Travelers's Dec. 24, 2014 Correspondence to Benecard, Ex. V. to Corona Cert., ECF No. 171-7.) On January 8, 2016, after Smart filed suit, Benecard sent another letter demanding Travelers defend it in the Smart action. (BMF ¶ 47; TRMF ¶ 47; Benecard's Jan. 8, 2016 Correspondence to Travelers, Ex. W to Corona Cert., ECF No. 171-7.) After reviewing the claims Smart asserted against Travelers, Travelers again denied coverage. (BMF ¶ 49; TRMF ¶ 49; Travelers's Feb. 5, 2016 Correspondence to Benecard 1, Ex. Y to Corona Cert., ECF No. 171-7.)

### B.   Disputed Facts

Travelers denies that Smart ever asserted a claim for false light based on Benecard's alleged "misrepresentations, omissions and concealments" regarding its Part D plan experience and expertise, or that Smart ever asserted any claim against Benecard based on its precontract statements or alleged bad press resulting from CMS's sanctions. (BMF ¶¶ 3, 8–9, 13, 19; TRMF ¶¶ 3, 8–9, 13, 19.) Travelers asserts that Smart never characterized as untrue the statements Benecard made prior to entering into the contract with Smart, and that Smart explicitly alleged all the misrepresentations and omissions were made by Benecard "in the last few months of 2012 and the first two months of 2013." (BMF ¶ 3; TRMF ¶ 3 (quoting Smart Compl. ¶ 96).) Travelers further denies that Smart alleged in its Complaint that Benecard caused Smart to submit inaccurate filings to CMS. (*Id.* ¶ 10.) As for Benecard's statement that it "never knowingly misrepresented

any facts[,] [and] any alleged misstatements arose, instead, from Benecard's overly hopeful assessment of its abilities," Travelers denies that is true and submits that Smart alleged in its Complaint "[w]hen Benecard made these misrepresentations and omissions to Smart, it knew they were false, or alternatively, it made them recklessly and without knowledge as to their truth or falsity." (*Id.* ¶ 11 (quoting Smart Compl. ¶ 97).)

Benecard disputes Travelers's assertion that Smart did not allege Benecard made representations to other people or organizations, claiming Smart alleged Benecard made representations to CMS and tens of thousands of Plan beneficiaries. (TMF ¶¶ 11–12; BRMF ¶¶ 11–12 (citing Smart Compl. ¶¶ 45, 47–48, 60, 65, 73).)

## II.   PARTIES' CLAIMS

In its eleven-count Amended Complaint, Benecard seeks: a declaratory judgment that Allied World Assurance Company (US) Inc. ("Allied World"), Atlantic Specialty, Travelers, RSUI Indemnity Company ("RSUI"), and ACE (collectively, "Defendants") must provide coverage for defense and indemnity costs arising from Smart's lawsuit against Benecard; compensatory and consequential damages arising from Allied World's, Atlantic Specialty's, and Travelers's alleged breaches of their insurance policies; and consequential damages arising from Allied World's, Atlantic Specialty's, and ACE's alleged bad faith conduct. (Am. Compl. ¶ 1., ECF No. 57) Benecard alleges:

1.   Allied World rejected its obligations under a D&O insurance policy it issued to fund Benecard's defense and pay any judgment or settlement arising from the Smart action. (Am. Compl. ¶¶ 67–68.)

2.   Atlantic Specialty rejected its obligations under a D&O insurance policy it issued to fund Benecard's defense and pay any judgment or settlement arising from the Smart action. (Am. Compl. ¶¶ 71–72.)

3.   RSUI failed to confirm its obligation under an Excess D&O insurance policy it issued to cover defense and indemnity costs arising from the Smart action. (*Id.* ¶¶ 75–76.)

4.    Travelers rejected its obligations under insurance policies it issued to fund Benecard's defense and pay any judgment or settlement arising from the Smart action. (*Id.* ¶¶ 79–80.)

5.    ACE failed to confirm its obligation under Excess insurance policies it issued to cover defense and indemnity costs arising from the Smart action. (*Id.* ¶¶ 83–84.)

6.    Allied World breached its contract by failing to fund Benecard's defense of the Smart action. (*Id.* ¶¶ 87–88.)

7.    Atlantic Specialty breached its contract by failing to fund Benecard's defense of the Smart action. (*Id.* ¶¶ 90–91.)

8.    Travelers breached its contract by failing to fund Benecard's defense of the Smart action. (*Id.* ¶¶ 93–94.)

9.    Atlantic Specialty breached its duty of good faith and fair dealing by, among other things, failing to (1) "act promptly upon communications regarding claims," (2) "conduct a prompt and objectively reasonable investigation of Benecard's coverage claims," and (3) "communicate promptly to Benecard the results of any such investigation." More specifically, Atlantic Specialty waited ten months before responding to Benecard's coverage request, failed to conduct an objectively reasonable investigation, and used a boilerplate form coverage declination letter. (*Id.* ¶¶ 97–98.)

10.    Allied World breached its duty of good faith and fair dealing by, among other things, (1) "refusing to accept Benecard's April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of claim," (2) refusing to accept Benecard's April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of circumstances," and (3) "refusing to accept Benecard's April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of circumstances under Allied's D&O Policy while simultaneously treating Benecard's identical April 30, 2014 communication and Smart's April 22, 2014 letter as a notice of circumstances under Allied's E&O Policy." (*Id.* ¶ 103.)

11.    ACE breached its duty of good faith and fair dealing by, among other things, failing to (1) "acknowledge and act reasonably promptly upon communications regarding claims," (2) "investigate promptly Benecard's coverage claims," and (3) "communicate promptly to Benecard the results of any such investigation." (*Id.* ¶ 108.)

Travelers filed a Counterclaim against Benecard, seeking declaratory judgments that it was not obligated under its Policies to provide defense or indemnity coverage. (Travelers Countercl. ¶¶ 52, 57, ECF No. 76.)

In its Motion, Benecard seeks reimbursement of its costs of defending the Smart action. (Moving Br. 1, ECF No. 171-1.) In addition to opposing Benecard's Motion, Travelers cross-moves for summary judgment, seeking judgment as a matter of law that its Policies unambiguously preclude any coverage for the Smart action and, consequently, that both Benecard's claims against Travelers—Counts IV and VIII—be dismissed with prejudice. (Cross Br. 1–2, ECF No. 180-1.) ACE joined in Travelers's Cross-Motion and seeks summary judgment that it is not obligated to provide defense or indemnity coverage under the excess policies it issued. (Notice of Joinder 2.)

## III.   PARTIES' POSITIONS

### A.   Benecard's Moving Brief

Benecard argues that Travelers must defend the claims against it because "Smart allegedly suffered injury through the oral and/or written publication of material;" "[s]uch material placed Benecard and Smart in a false light;" and "[s]uch material disparaged Smart's services." (Moving Br. 11.) To support its argument that Smart's claims were based, in part, on published materials, Benecard cites CMS publishing its sanctions on its website. (*Id.* at 12 (citing Smart Compl. ¶ 50).) Benecard also quotes various internet publications discussing the problems with Smart's Plans. (*Id.* at 13 (quoting Insure Me Kevin Commentary, Ex. J to Corona Cert., ECF No. 171-5 (discussing the administrative problems with Smart's plan and opining Smart did not have robust IT infrastructure); Drug Channels Commentary, Ex. K to Corona Cert., ECF No. 171-5 (discussing CMS sanctions); Drug Channels Commentary, Ex. L to Corona Cert., ECF No. 171-5 (opining that the purchaser of Smart's plan likely paid almost nothing because it "bombed" in the market)).) Benecard argues "false light" must be interpreted broadly and not limited to the common law invasion of privacy tort because Travelers failed to define the term. (*Id.* at 15–16.) Specifically, Benecard argues that Smart alleged two false light claims: (1) Benecard placed itself in a false

13

light as having the experience and expertise to administer Smart's plans, and (2) Benecard's misrepresentations placed Smart in the false light of lacking Part D plan expertise in the eyes of CMS and the public. (*Id.* at 16–17.)

Turning to disparagement, Benecard claims Travelers must defend it against any claim for personal injury caused by the publication of material that "disparages a person's or organization's goods, products or services." (*Id.* at 19 (quoting Travelers 2013 Policy at TRAV-1280).) Benecard asserts "Smart allegedly faced direct disparagement arising from Benecard's conduct," and highlights that Benecard's January 8, 2016, correspondence demanding coverage a second time was internally transferred by Travelers "due to the potential business disparagement." (*Id.* (quoting Claims Notes, Ex. X to Corona Cert., ECF No. 171-7).) Further, Benecard contends the Court should find implied disparagement because Benecard allegedly falsely represented its services, thus harming another. (*Id.* at 20–22.) Benecard claims Smart's adoption and publication of false material provided by Benecard disparaged Smart's services. (*Id.* at 22.) As an example, Benecard explains that it inaccurately reported the number of people who had not been enrolled in compliance with the enrollment process's regulations and that, as a result, Smart had to revise the figure given to CMS. (*Id.* (citing Smart's Opp'n to Benecard's Mot. for Partial Summ. J., Ex. E to Corona Cert., ECF No. 171-5).) Benecard also points to Smart's alleged misrepresentations. (*Id.* at 22–23 (citing Smart's Compl. ¶¶ 30, 58, 95, 104).)

### B.     Travelers's Opposition and Moving Brief

Travelers argues "[t]he Smart Action is not covered because Smart did not contend that Benecard was legally obligated to pay damages because Benecard published material that disparaged Smart['s] goods, products[,] or services or material that placed Smart in a 'false light.'" (Cross Br. 10.) "Rather," Travelers submits, "Smart claimed damages from Benecard for breach of contract and fraudulent misrepresentation based upon [Benecard's] deficient contract

14

performance and [Benecard's] misrepresentations to Smart about its own . . . abilities to correct those performance deficiencies." (*Id.*)

Travelers asks the Court to adopt the framework applied by the Third Circuit in *Albion Eng'g Co. v. Hartford Fire Ins. Co.*, 779 F. App'x 85 (3d Cir. 2019). (*Id.* at 10.) Travelers explains that, consistent with New Jersey precedent, well-known legal offenses referenced in an insurance policy are to be given their established legal meanings. (*Id.* (citing *Albion*, 779 F. App'x at 87).) Further, Travelers claims, the Court should not look to extrinsic evidence beyond Smart's Complaint where there is no ambiguity. (*Id.* at 11 (citing *Albion*, 779 F. App'x at 90).) Travelers concludes that its Policies do not cover the Smart action because "it is black letter law that a disparagement claim requires that a plaintiff complain of a malicious publication by the defendant of false statements concerning the plaintiff's property, product or business," and Smart never made such allegations. (*Id.* 12 (citing *Albion*, 779 F. App'x at 88; *Enigma Software Group USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 291 (S.D.N.Y. 2016)).)

Travelers alleges Benecard is trying to distort both its Policies and the Smart action by alleging its wrongful conduct resulted in negative publications. (*Id.* at 13.) But, according to Travelers, Benecard's argument fails because—as demonstrated by Smart's mediation statement—the dispute arose out of "the failure of Benecard . . . to perform its contractual obligations to manage a Medicare Prescription Drug Part D Plan," and "involves a number of intentionally false representations and material omissions that Benecard made to convince Smart not to terminate the contract." (*Id.* at 13–14 (quoting Smart's Mediation Statement 1).) Travelers contends that the websites Benecard points to are unrelated to Smart's claims and that Benecard's counsel retrieved them solely for this litigation. (*Id.* at 14.) Travelers submits Smart never complained of "disparagement," and never sought damages for reputational harm. (*Id.*) Further,

Travelers asserts that Benecard never submitted evidence of such a claim by Smart to Travelers when it sought defense coverage. (*Id.* at 14–15.) Travelers argues that imposing a defense obligation merely because the insured's misconduct caused the claimant to look bad overlooks the Third Circuit's decision in *Albion* and the plain language of the Policies, which requires "damages because of" the "publication . . . of material that . . . disparages a person's or organization['] s goods, products or services." (*Id.* at 16 (quoting Travelers 2012 Policy, at TRAV-1163, 1179).)

Separately, Travelers submits that the statements published on the websites that Benecard cites are not actionable because they were truthful. (*Id.* at 16 (*Albion*, 779 F. App'x at 90).) Even if they were actionable, Travelers contends coverage for personal injury offenses is only intended to reach acts by the insured—not third parties. (*Id.* (citing *Cty. of Columbia v. Cont'l Ins. Co.*, 83 N.Y.2d 618, 627 (1994)).)

Addressing Benecard's claim of implied disparagement, Travelers submits that New Jersey does not recognize such a cause of action, (*id.* at 17 (citing *Albion*, 779 F. App'x at 90)), and, even if it did, the cases relied on by Benecard have either been disavowed or are taken out of context, (*id.* at 17–18).

Travelers next turns to Benecard's claim of coverage under the false light provision. (*Id.* at 20.) Beyond *Albion*, Travelers contends "false light" in the Policies should be construed as consistent with the common law tort because the language of the Policies closely tracks the language used by courts when describing the tort and because it appears alongside three of the four privacy torts in the Policies. (*Id.* at 21–23 (citing *Jack Daniels Motors, Inc. v. Universal Underwriters Ins. Co.*, No. 10-05376, 2011 U.S. Dist. LEXIS 9665, *5–6 (D.N.J. Feb. 1, 2011) ("Ordinarily, the coupling of words denotes an intention that they shall be understood in the same general sense. The natural, ordinary[,] and general meaning of terms and expressions may be

limited, qualified[,] and specialized by those in immediate association.") (citation and internal quotation marks omitted), *aff'd*, 446 Fed. App'x. 504 (3d Cir. 2011)).) Travelers submits Smart never made a false light claim because it never alleged Benecard published something false about Smart, and Benecard's misrepresentations about its own performance cannot substitute for that element. (*Id.* at 23–24 (citing *G.D. v. Kenny*, 205 N.J. 275, 309 (2011)).) On a more basic level, Travelers argues, the plain language of the Policies and New Jersey case law make clear that false light claims are not available for corporate plaintiffs, (*id.* at 24 (citing *N.O.C., Inc. v. Schaefer*, 197 N.J. Super. 249, 253 (Law Div. 1984) (citation omitted))), and false light claims are not cognizable under New York law, which governed the Smart action, (*id.* at 25 (citing *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 123–24 (1993))).

Finally, Travelers submits that because it was under no obligation to provide defense coverage to Benecard for the Smart action, it also has no obligation to provide indemnity coverage. (*Id.* at 29.) Moreover, Travelers asserts that because Smart alleged "Benecard made all of the misrepresentations and material omissions . . . in the last few months of 2012 and the first two months of 2013," (*id.* at 30 (Smart Compl. ¶ 96)), the 2011 and 2013 Policies cannot apply because they only provided coverage from April 12, 2011 to April 12, 2012, and from April 12, 2013 to April 12, 2014, respectively, (*id.* at 30 (citing Travelers 2011 Policy at TRAV-1049; Travelers 2013 Policy at TRAV-1258; 2011 Umbrella Policy at TRAV-1345; 2013 Umbrella Policy at TRAV-1451)).

## C.     Benecard's Reply and Opposition

Benecard submits that Travelers is incorrect on the law and that "facts outside the complaint may trigger the duty to defend." (Benecard's Opp'n 6–7, ECF No. 188 (quoting *SL Indus. v. Am. Motorists Ins. Co.*, 128 N.J. 188, 198 (1992)) (citing *Abouzaid v. Mansard Gardens Assocs., LLC*, 207 N.J. 67, 81 (2011)).) Further, Benecard asserts Travelers is incorrect that

well-known legal terms should be construed in accord with their legal meanings, submitting that the Court should construe the term broadly, as would a layperson, and that any ambiguity must be read in favor of coverage. (*Id.* at 13–14 (citing *Mazzilli v. Accident & Cas. Ins. Co. of Winterthur, Switzerland*, 35 N.J. 1, 7 (1961); *Rudolph v. Home Indem. Co.*, 138 N.J. Super. 125, 135–36 (Law. Div. 1975)).)

Benecard argues the extrinsic evidence and Smart's Complaint confirm that Smart suffered reputational harm from Benecard's alleged misstatements. (*Id.* at 17.) Pointing to its handling of tens of thousands of member calls, during which Benecard employees told callers they were Smart representatives, Benecard asserts Smart explicitly and repeatedly alleged that Benecard's false statements to callers regarding the Plans constituted the publication of disparaging, untrue information about Smart, casting it in a false light. (*Id.* at 10 (citing Smart's Compl. ¶¶ 45, 47–48, 60, 65, 73; *JNL Mgmt., LLC v. Hackensack Univ. Med. Ctr.*, No. 18-5221, 2019 U.S. Dist. LEXIS 74247, at *18 (D.N.J. May 2, 2019)).) Benecard further points to "[e]ach and every electronic and oral transmission to third party CMS of Benecard's alleged Smart misrepresentations." (*Id.* at 10–11.) Benecard adds that the Policies do not require Benecard to be the entity that made the publication, only that it be published. (*Id.* at 11 (citing Travelers 2013 Policy at TRAV-1280).)

In response to Travelers's argument that New York does not recognize a false light tort, Benecard alleges that has no bearing on coverage because an insured could not know under what state law it would be sued and because reading the Policies as applying only where the tort exists would render their coverage illusory in several states. (*Id.* at 16.) Benecard stresses that the obligation to defend arises regardless if the claim is groundless or fraudulent. (*Id.* at 17 (citing *Voorhees v. Preferred Mut. Ins. Co.*, 128 N.J. 165, 174 (1992)).)

Turning to the Policies' disparagement coverage, Benecard argues that the Third Circuit in *Albion* incorrectly disregarded the core tenets of New Jersey law by incorporating the state's tort law. (*Id.* at 19–20.) Even if the Third Circuit did apply the law correctly, Benecard contends, *Albion* is inapplicable here on the facts, namely Benecard's numerous alleged misrepresentations. (*Id.* at 20–21.) Benecard also argues the Third Circuit was incorrect in finding New Jersey did not recognize a claim for implied disparagement, asserting that the Third Circuit misinterpreted *Dairy Stores, Inc. v. Sentinel Pub. Co.*, 104 N.J. 125 (1986), and *DeAngelis v. Hill*, 180 N.J. 1, 18 (2004), which did not consider implied disparagement claims. (*Id.* at 22–23.)

Benecard argues Smart's allegations triggered coverage under all of the Policies issued by Travelers. (*Id.* at 8–9.) The 2011 Policies, Benecard asserts, were triggered by Smart's allegations that Benecard convinced Smart that it had a history of managing commercial plans, developed a Part D plan, could handle the claims processing rules, would be able to adjudicate claims, and would hire staff with Part D experience. (*Id.* at 8–9 (citing Smart's Mediation Statement 3).) As for the 2013 Policies, Benecard argues coverage was triggered because Smart alleged (1) that "in the first four months of 2013 alone, more than 30,000 Plan beneficiaries were improperly denied coverage;" (2) that in June 2013 CMS advised Smart the Plans were still not adjudicating claims properly; and (3) because CMS informed Smart it would terminate the Plans in August 2013. (*Id.* at 8–10 (citing Smart Compl. ¶¶ 48, 73).)

### D.      Travelers's Reply

Travelers argues that the Court should not consider Benecard's irrelevant extrinsic evidence and confine its inquiry to what Smart sought damages for in its Complaint. (Travelers's Reply 4 (citing *Voorhees*, 128 N.J. at 173), ECF No. 193.) Moreover, Travelers contends, even if the extrinsic evidence had any bearing on Smart's claims, New Jersey law still does not permit it to be considered because the evidence was presented to Travelers after the conclusion of the

underlying case. (*Id.* at 4–5 (citing *SL Indus.*, 128 N.J. at 199–200).) Travelers also urges the Court not to follow Benecard's direction and disregard *Albion*. (*Id.* at 8–9.)

Turning to the allegations in Smart's Complaint, Travelers contends the portions cited by Benecard are misquoted in an attempt to distort Smart's claims, like "publish[ing] to third party CMS," which does not appear in Smart's Complaint. (*Id.* at 6 (comparing Benecard's Opp'n Br. 3, with Smart's Compl. ¶¶ 45, 47).) Beyond its distortions, Travelers argues, Benecard impermissibly seeks to have the Court overread its Policies, which require the publication of material that disparages an organization's services, to include any statement that has the effect of disparaging another. (*Id.* at 10–11.) Travelers submits that New Jersey law requires the publication of derogatory material to be calculated to prevent others from dealing with the subject, (*id.* at 11 (citing *Patel v. Soriano*, 369 N.J. Super. 192, 248 (App. Div. 2004)), and Smart never made such an allegation, (*id.*).

Regarding false light, Travelers argues the grouping of the common law torts together in the Policies support its interpretation. (*Id.* at 13.) Travelers further submits that the fact some states do not recognize the false light tort does not mean that its coverage becomes illusory. (*Id.*)

As for the applicability of the 2011 and 2013 Policies, Travelers claims there can be no coverage under the 2011 Policies based on misrepresentation about Benecard's experience because neither the Smart Complaint or its Mediation Statement contain such an allegation, and Smart never sought damages based on such a claim. (*Id.* at 7.) Regarding the 2013 Policies, Travelers contends that Smart's allegations of improper claims adjudications do not assert a disparagement or false light claim under the Policies. (*Id.* at 8.) Travelers again highlights that the Smart Complaint alleged "Benecard made all of the misrepresentations and material omissions . . . in the last few months of 2012 and the first two months of 2013." (*Id.* (citing Smart Compl. ¶ 96.)

### E.     ACE's Joinder Correspondence

In addition to joining portions of Travelers's Reply, ACE also joins section V of Atlantic Specialty's Reply Brief in Support of its Cross-Motion for Summary Judgment (ECF No. 198), in which Atlantic Specialty argues that, absent coverage under the Policy, Benecard does not have a claim for bad faith. (ACE's Joinder in Reply (joining Atlantic Specialty's Reply 12–13, ECF No. 198).)

## IV.   <u>LEGAL STANDARD</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a "genuine" dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248).

"In evaluating the evidence, the Court must consider all facts and their logical inferences in the light most favorable to the non-moving party." *Rhodes v. Marix Servicing, LLC*, 302 F. Supp. 3d 656, 661 (D.N.J. 2018) (citing *Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002)). "While the moving party bears the initial burden of proving an absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party to 'set forth specific facts showing that there is a genuine [dispute] for trial.'" *Id.* (quoting *Anderson*, 477 U.S. at 250). "Unsupported allegations, subjective beliefs, or argument alone . . . cannot forestall summary judgment." *Read v. Profeta*, 397 F. Supp. 3d 597, 625 (D.N.J. 2019). "Thus, if the nonmoving party fails 'to make a showing sufficient to establish the existence of an element essential to that

party's case, . . . there can be no genuine issue of material fact . . . .'" *Id.* (quoting *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quotation marks omitted)). "In considering the motion, the Court 'does not resolve factual disputes or make credibility determinations.'" *Rhodes*, 302 F. Supp. 3d at 661 (quoting *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125,1127 (3d Cir. 1995)). "When ruling on cross-motions for summary judgment, the court must consider the motions independently, and view the evidence on each motion in the light most favorable to the party opposing the motion." *Einhorn v. Kaleck Bros.*, 713 F. Supp. 2d 417, 421 (D.N.J. 2010).

## V.   DISCUSSION

Interpreting an insurance contract is a legal question to be resolved by the Court. *Rena. Inc. v. Brian*, 708 A.2d 747, 756 (N.J. Super. Ct. App. Div. 1998). "In attempting to discern the meaning of a provision in an insurance contract, the plain language is ordinarily the most direct route." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008). "If the language is clear, that is the end of the inquiry." *Id.* "If the plain language of the policy is unambiguous," the Court should "not engage in a strained construction to support the imposition of liability or write a better policy for the insured than the one purchased." *Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 129 A.3d 1069, 1075 (N.J. 2016) (quoting *Chubb Custom Ins. Co.*, 948 A.2d at 1289) (internal citations omitted)).

A provision in an insurance policy that "is subject to more than one reasonable interpretation . . . is ambiguous." *Templo Fuente*, 129 A.3d at 1075. "Where the [insurance] policy language supports two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied." *Progressive Cas. Ins. Co. v. Hurley*, 765 A.2d 195, 202 (N.J. 2001) (quoting *Lundy v. Aetna Cas. & Sur. Co.*, 458 A.2d 106, 111 (N.J. 1983)). This approach, however, is limited to instances where "the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Id.* (citations omitted).

"When construing an ambiguous clause in an insurance policy, courts should consider whether clearer draftsmanship by the insurer 'would have put the matter beyond reasonable question.'" *Id.* (quoting *Doto v. Russo*, 659 A.2d 1371, 1377 (N.J. 1995)). "Far-fetched interpretations of a policy exclusion are insufficient to create an ambiguity requiring coverage." *Wear v. Selective Ins. Co.*, 190 A.3d 519, 528 (N.J. Super. Ct. App. Div. 2018). "Neither the duty to defend nor the duty to indemnify 'exists except with respect to occurrences for which the policy provides coverage.'" *Id.* at 528–29 (quoting *Hartford Accident & Indem. Co. v. Aetna Life & Cas. Ins. Co.*, 98 N.J. 18, 22 (1984)).

The parties dispute whether well-known offenses must be construed in accord with their legal meanings. Without discussion on this point, the Third Circuit in *Albion* turned to the common law elements of trade libel, product disparagement, and defamation under New Jersey law as a guide when assessing whether the claim against the insured included an electronic, oral, written, or other publication of material that slanders, libels, or disparages the claimant's goods, products, or services. 779 F. App'x at 87–88. In two unpublished New Jersey appellate cases, New Jersey courts also looked to common law elements when determining insurance coverage. *Penn Nat. Ins. Co. v. Grp. C Commc'ns, Inc.*, No. A-2813-09T3, 2011 WL 3241491, at *10 (N.J. Super. Ct. App. Div. Aug. 1, 2011) (construing the undefined term "invasion of privacy" in accord with the broadest definition of the tort); *Harleysville Ins. Co. of N.J. v. M&R Mech. Contractors*, No. A-4812-07T2, 2009 WL 1675712, at *5 (N.J. Super. Ct. App. Div. June 17, 2009) (considering the elements of malicious use of process in construing the policy offense of "malicious prosecution or abuse of process"). In *Rudolph v. The Home Indemnity Company*, the New Jersey Superior Court, Law Division, found the common law and statutory definitions of "theft" and "larceny" were much narrower than that understood by a layperson and, thus, the principles of policy

interpretation required the Court to construe the terms broadly in accord with the insured's expectations. 350 A.2d 285, 291 (N.J. Super. Ct. Law Div. 1975). The Court does not read these cases as being in conflict. Instead, and consistent with New Jersey's principles of policy interpretation, the Court can consider the common law definition of a legal term as a guide to interpreting the policy, but, where undefined, should adopt a broad interpretation of the term. That does not mean, however, that the Court must adopt any strained definition of the term proffered by the insured.

"Under New Jersey law, false light is a cause of action arising out of the greater tort of invasion of privacy," and "closely follows the Restatement (Second) definition," which defines it as:

> One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy, if (a) the false light in which the other was placed would be highly offensive to a reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light which the other would be placed.

*Gillon v. Bernstein*, 218 F. Supp. 3d 285, 303 (D.N.J. 2016) (quoting Restatement (Second) of Torts § 652E (1977)). "Under New Jersey law, elements of a trade libel or product disparagement claim are (1) publication; (2) with malice; (3) of false allegations concerning another's property, product, or business; and (4) special—i.e., pecuniary—damages." *Albion*, 779 F. App'x at 88; *accord Sys. Operations, Inc. v. Sci. Games Dev. Corp.*, 555 F.2d 1131, 1140 (3d Cir. 1977). "The elements of a disparagement action include proof of publication of material derogatory to the quality of a plaintiff's business, or to his business in general, of a kind calculated to prevent others from dealing with him, or otherwise to interfere adversely with his relations with others." *Patel v. Soriano*, 848 A.2d 803, 835 (N.J. Super. Ct. App. Div. 2004). "To establish loss of trade or other dealings, plaintiff must show the falsehood was communicated to a third person and played a

material and substantial part in leading others not to deal with plaintiff." *Id.* New Jersey does not recognize implicit disparagement. *Albion*, 779 F. App'x at 90. Looking to a lay dictionary, "disparagement" is defined as "the publication of false and injurious statements that are derogatory of another's property, business, or product." *Disparagement*, Merriam-Webster, https://www.merriam-webster.com/legal/disparagement (May 3, 2020).

"The duty to defend is triggered by the filing of a complaint alleging a covered claim." *Abouzaid v. Mansard Gardens Assocs., LLC*, 23 A.3d 338, 346 (N.J. 2011). "As a practical matter, the determination of an insurer's duty to defend requires review of the complaint with liberality to ascertain whether the insurer will be obligated to indemnify the insured 'if the allegations are sustained.'" *Id.* (quoting *Danek v. Hommer*, 28 N.J. Super. 68, 77 (App. Div. 1953), *aff'd*, 15 N.J. 573 (1954)). "[T]he complaint should be laid alongside the policy and a determination made as to whether, if the allegations are sustained, the insurer will be required to pay the resulting judgment, and in reaching a conclusion, doubts should be resolved in favor of the insured." *Danek v. Hommer*, 100 A.2d 198, 203 (N.J. Super. Ct. App. Div. 1953), *aff'd*, 105 A.2d 677 (1954). If a claim is potentially covered by the policy at issue, then a duty to defend will be found. *Abouzaid*, 23 A.3d at 346. "[T]he potential merit of the claim is immaterial . . . ." *Id.* at 347.

That "analysis is not necessarily limited to the facts asserted in the complaint." *Id.* The duty to defend may be "triggered by facts indicating potential coverage that arise during the resolution of the underlying dispute." *SL Indus., Inc. v. Am. Motorists Ins. Co.*, 607 A.2d 1266, 1272 (N.J. 1992). An insurer, thus, cannot "construct a formal fortress of the third party's pleadings and . . . retreat behind its walls, thereby successfully ignoring true but unpleaded facts within its knowledge." *Id.* "[T]he insured being sued is responsible for promptly conveying to its insurance company the information that it believes will trigger coverage." *Id.*

### A.   Benecard's Motion for Partial Summary Judgment

Because the parties agree that the terms of the Polices are substantially similar in all material respects for the purposes of the legal issues before the Court, (BMF ¶ 25, TRMF ¶ 25), the Court cites to the 2012 Travelers Policy as the exemplar. The Policies state "[Travelers] will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal and advertising injury' to which this insurance applies," and that the Policies apply to "'personal and advertising injury' caused by an offense arising out of [Benecard's] business." (Travelers 2012 Policy at TRAV-1163.) Relevant to the issue before the Court, the Policies define "personal injury" as "[o]ral or written publication . . . of material that . . . disparages a person's or organization's goods, products or services, provided that the claim is made or the 'suit' is brought by a person or organization . . . that claims to have had its goods, products or services disparaged." (Travelers 2012 Policy, at TRAV-1179.) Also included in the definition of "personal injury" is "[o]ral or written publication, including publication by electronic means, of material that . . . [u]nreasonably places a person in a false light." (*Id.*) The Policies identify both as "offenses." (*Id.*)

The Court notes "that the duty to defend is triggered by facts known to the insurer," and it is "the insured being sued [that] is responsible for promptly conveying to its insurance company the information that it believes will trigger coverage"; "the insurer has no duty to investigate possible ramifications of the underlying suit that could trigger coverage." *SL Indus.*, 607 A.2d at 1272. Prior to Smart filing its Complaint, Benecard sent correspondence to Travelers that did not itself describe the claims Smart intended to assert against it, but attached Smart's December 15, 2014 correspondence. (Benecard's Dec. 19, 2014 Correspondence to Travelers.) Smart's letter stated "for the reasons described below, Smart intends to pursue claims against Benecard for, among other things, breach of contract and fraud." (Smart's Dec. 15, 2014 Correspondence 1.) Among a litany of alleged failures to perform as required under their contract, Smart's

correspondence contains a single paragraph detailing misrepresentations that Benecard made to Smart. (*Id.* at 5.) None of the allegations within that paragraph concern alleged statements made to anyone else besides Smart. (*Id.*) In its second letter seeking coverage from Travelers, Benecard claims that the misrepresentations alleged by Smart fell within the Policies' false light provision. (Benecard's Jan. 8, 2016 Correspondence to Travelers 2–3.) The online publications Benecard cites in support of its claim for coverage are unhelpful because there is no evidence it ever brought the allegedly disparaging commentary to Travelers's attention. Moreover, such online press is not mentioned anywhere in Smart's Complaint or even its Mediation Statement.

Beginning with the disparagement provision, the Court finds no evidence that Benecard sought coverage under the Policies for disparagement before this lawsuit, and the Complaint reveals no such claim was implicated in Smart's claims. Benecard's claim of coverage is entirely based on its assertion that its alleged misrepresentations to Smart and misadministration of the call center ultimately caused Smart reputational damages. There is nothing in Smart's Complaint, Mediation Statement, or otherwise, alleging Benecard maliciously made false statements about Smart's services or business, much less that it was seeking damages based on disparagement. Plainly, Smart consistently claimed damages for breach of contract and Benecard's fraudulent statements or omissions made to it—not to third parties. The closest Benecard comes is its proffer that Smart relayed false information provided by Benecard to CMS, harming its reputation with CMS, and that Benecard's call center employees allegedly relayed incorrect information to the Plans' members. Such allegations fall far short of a disparagement claim. With respect to CMS, Smart never alleged Benecard made false statements about its services. Rather, Smart alleged Benecard made false statements about its own performance, compliance with the contract, and cooperation with Smart's attempted remedial measures. To read the Policies as expansively as

Benecard requests—specifically, that any misrepresentations it made ultimately had the effect of damaging Smart's reputation—ignores the Policies' twice usage of the term "offense" and their use of the term "publish," which makes clear that Benecard must have made the disparaging statement to a third party. Even a lay definition of "disparagement" requires Benecard to have published some false or injurious statement about Smart's services to someone other than Smart. To read the disparagement provision as including any untrue statement made to Smart that ultimately harmed its reputation would effectively read out the "offense" and "publish" language. Simply put, a failure to adequately perform under a contract that harms the other party's reputation does not become disparagement.

With respect to Benecard's claim of coverage under the false light provision, Benecard identifies two alleged claims: (1) that Benecard placed itself in a false light as having the experience and expertise to administer Smart's plans, and (2) that Benecard's misrepresentations placed Smart in the false light of lacking Part D plan expertise in the eyes of CMS and the public. (Moving Br. 16–17.) Smart never asserted a claim for false light, nor could it have under New York law; furthermore, the Court agrees with Travelers that Smart's Complaint did not implicate a false light claim. Smart's two-count Complaint sought damages based on Benecard's alleged breach of contract and fraudulent misrepresentations, omissions, or concealments, which allegedly induced it into maintaining the contract with Benecard. (Smart Compl. ¶¶ 92, 101–05.) Benecard's argument that Smart alleged a false light claim because it alleged misrepresentations that painted Benecard as more competent than it actually was is a strained interpretation that ignores the provision's plain language. Benecard would have the Court read the false light provision as effectively encompassing all claims involving alleged misrepresentations. Such a reading ignores the publication requirement in the text of the Policies, the use of the term "offense," which implies

intent, and ignores the fact that the provision is found alongside three of the four common law privacy torts.

As for its argument that Smart alleged Benecard put it in a false light, Benecard again highlights its fielding of Plan members' calls during which Benecard employees, acting as Smart representatives, relayed incorrect coverage information. (Benecard's Opp'n Br. 10 (citing Smart's Compl. ¶¶ 45, 47–48, 60, 65, 73).) Finding that such statements constitute false light would overextend the definition because such mistakes in administering coverage are not statements about Smart. Furthermore, the cited portions of Smart's Complaint largely concern Benecard's alleged misrepresentations to Smart that it had fixed, or was fixing, the problems identified by CMS. (Smart's Compl. ¶¶ 45, 47–48, 60, 65, 73.) The plain language of the Policies require publication, whereas all of the allegations relied on by Benecard concern representations made by Benecard to Smart. A false light claim is not within the call of the Complaint.

Furthermore, the Court finds merit to Travelers's position that its false light coverage does not include claims by corporations. The text of the Policies limit "personal injury" to "[o]ral or written publication," that "[u]nreasonably places a *person* in a false light." (Travelers 2012 Policy at TRAV-1179 (emphasis added).) The inclusion of "person" is not limited to the Policies' false light provision, either. It is also found in the provisions dealing with appropriation of a person's name, voice, photograph or likeness, and the provision concerning disclosure of private information. (*Id.*) As Travelers highlights, these three sections are found together and echo three of the four common law privacy torts. (*See id.*) Limiting coverage to common law invasion of privacy torts asserted by a person is consistent with New Jersey law and the Restatement, which hold corporations do not have a cause of action for any of the four forms of invasion of privacy because "[t]he tort of invasion of privacy focuses on the humiliation and intimate personal distress

suffered by an individual as a result of intrusive behavior." *N.O.C., Inc. v. Schaefer*, 484 A.2d 729, 730 (N.J. Super. Ct. Law. Div. 1984) (citing Restatement (Second) of Torts § 652I cmt. c. (1977)). The Policies' plain text limits applicability to publications that place a person in a false light, so even if there were allegations that Benecard published materials placing Smart in a false light there could be no recovery under the Policies.

Accordingly, after considering the plain language of the Policies, Smart's Complaint, and the extrinsic evidence of which Travelers may have been aware, the Court finds that there is no potential coverage for the Smart action under the Policies. Thus, the Court finds Benecard was not entitled to defense coverage under the Policies and denies Benecard's Motion.

### B.    Travelers's Cross-Motion

Having found no potential coverage under the Policies for the Smart action, the Court agrees that there cannot be indemnity coverage under the Policies. As for the Umbrella Policies, there can be no coverage under the Umbrella Policies where there is no potential coverage pursuant to the underlying Policies. (*See, e.g.*, 2011 Umbrella Policy, at TRAV-1349, 1371.)[1]

Consequently, the Court grants Travelers's Cross-Motion and dismisses Counts IV and VIII of Benecard's Amended Complaint with prejudice. Finding no potential for coverage of the Smart action under the Policies, the Court grants summary judgment on Travelers's Counterclaim and enters a judgment in its favor, declaring that Travelers does not have any obligation to defend, indemnify, or reimburse Benecard in connection with the Smart action.

---

[1] Additionally, although the Court need not reach the issue, based on Smart's allegation that "Benecard made all of the misrepresentations and material omissions . . . in the last few months of 2012 and the first two months of 2013," (Smart Compl. ¶ 96), the Court agrees with Travelers for the reasons stated in its Cross Brief and Reply that the Smart action falls outside of the coverage periods for the 2011 and 2013 Policies. (Travelers 2011 Policy at TRAV-1073; Travelers 2013 Policy at TRAV-1265; 2011 Umbrella Policy at TRAV-1371–72; 2013 Umbrella Policy at TRAV-1455).

C.    ACE's Excess Policies

The ACE Policies contain substantively the same terms as the Travelers Policies, providing "[ACE] will pay on . . . the ULTIMATE NET LOSS (1) in excess of all UNDERLYING INSURANCE . . . . If any UNDERLYING INSURANCE does not pay a loss for reasons other than the exhaustion of an aggregate limit of insurance then WE shall not pay such loss." (2011 ACE Policy at ACE145; 2012 ACE Policy at ACE175; 2013 ACE Policy at ACE119.) The underlying insurance for the 2011, 2012, and 2013 ACE Policies are the 2011, 2012, and 2013 Travelers Policies, respectively. (2011 ACE Policy at ACE141; 2012 ACE Policy at ACE164; 2013 ACE Policy at ACE96.) A "follow form" excess policy is a policy in which the coverage issues in the excess policy turn solely on the interpretation of the underlying primary policy. *See Houbigant, Inc. v. Fed. Ins. Co.*, 374 F.3d 192, 203 (3d Cir. 2004). Because the Court holds the Travelers Policies do not provide coverage for the Smart action, Benecard cannot recover under ACE's Policies by their explicit terms.

The Court turns to Benecard's bad faith claim against ACE. "Under the 'fairly debatable' standard, a claimant who could not have established as a matter of law a right to summary judgment on the substantive claim would not be entitled to assert a claim for an insurer's bad-faith refusal to pay the claim." *Pickett v. Lloyd's*, 621 A.2d 445, 454 (N.J. 1993). "A more difficult application of the standard arises when the issue involves not a denial or refusal to pay a claim but, as here, inattention to payment of a *valid, uncontested claim*." *Id.* (emphasis added). "In the case of processing delay, bad faith is established by showing that no valid reasons existed to delay processing the claim and the insurance company knew or recklessly disregarded the fact that no valid reasons supported the delay." *Id.* at 457–58. "In either case (denial or delay), liability may be imposed for consequential economic losses that are fairly within the contemplation of the insurance company." *Id.* Whether arising under a denial of coverage or a delay in processing a

31

claim, "the test appears to be essentially the same." *Id.* at 454. Because the Court finds Benecard is not entitled to coverage, it cannot assert a claim for bad faith against ACE. The Court, therefore, enters summary judgment in ACE's favor, dismissing Counts V and XI of Benecard's Complaint with prejudice.

## VI.    CONCLUSION

For the reasons stated above, Benecard's Motion for Partial Summary Judgement is denied, and Travelers's Cross-Motion for Summary Judgment is granted. All claims as to Travelers (Counts IV and VIII) are dismissed with prejudice, and the Court enters summary judgment on Travelers's Counterclaim, declaring that Travelers has no obligation to defend, indemnify, or reimburse any sums to Benecard in connection with the Smart action. The Court also grants ACE's Motion, enters summary judgment in its favor, and dismisses Counts V and XI of Benecard's Amended Complaint with prejudice. An order consistent with this Memorandum Opinion will be entered.

s/ Michael A. Shipp
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**